### RICHMOND CEDAR WORKS v. STRINGFELLOW et al.

(District Court, E. D. North Carolina. September 20, 1916.)

1. EVIDENCE ⊜343(3)—CERTIFIED COPIES—ADMISSIBILITY.
    Under Revisal N. C. 1905, § 988, declaring that a duly certified copy of any deed or writing required or allowed to be registered may be registered in any county, a certified copy of a deed over 100 years old, which showed that the original was a perfect deed of conveyance, is admissible to probate and registration, though by reason of the mutilation of the records some lines of the conveyance showing the consideration therefor were lost; this being particularly true where an earlier certified copy of the same conveyance included the destroyed portions.
    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1317, 1318; Dec. Dig. ⊜343(3).]

2. EVIDENCE ⊜343(3)—DOCUMENTARY EVIDENCE—ANCIENT INSTRUMENTS.
    In an action to recover land, plaintiff introduced a certified copy of a deed about 100 years old reciting that Elisha Hassell had sold and conveyed the property. In the attestation clause the name of the grantor was written Elijah, and the signature, which was by mark, was Elijah. On the certified copy was an indorsement that the grantor Elijah did therefor warrant and defend, etc., and this purported to be signed Elisha. The same witnesses attested both signatures and the deed was duly proven by one of the attesting witnesses shortly after execution. Held, that it was manifest that the name of the grantor was either incorrectly spelled by the conveyancer or incorrectly copied by the register in recording, and it

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was admissible in evidence to establish a conveyance by the said Elisha Hassell.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1317, 1318; Dec. Dig. ⊂⇒343(3).]

3. DESCENT AND DISTRIBUTION ⊂⇒19—PRESUMPTION—INTESTACY.

Where there is no evidence showing that a deceased grantor left a will, it will be presumed that he died intestate and that the property descended to his heirs who conveyed the land.

[Ed. Note.—For other cases, see Descent and Distribution, Cent. Dig. §§ 11–13; Dec. Dig. ⊂⇒19.]

4. NAMES ⊂⇒18—PRESUMPTIONS—IDENTITY OF GRANTOR.

In an action to recover land, plaintiff showed in his chain of title a conveyance to William C. duly recorded and a subsequent conveyance six years later by William R. C. There was no evidence that the grantee and grantor were the same person, but there was no showing of the death of the grantee, or that any other person named William C. ever owned the land. *Held*, that in view of the antiquity of the deed, which was over 50 years old, it will be presumed that William C. and William R. C. are the same.

[Ed. Note.—For other cases, see Names, Cent. Dig. §§ 1, 4, 17; Dec. Dig. ⊂⇒18.]

5. ACKNOWLEDGMENT ⊂⇒29—REGISTRATION OF DEEDS—CERTIFICATE OF PROBATE.

Code N. C. 1883, § 1246, subd. 8, provides that, when the subscribing witness to a deed is a nonresident or dead and the maker shall also be a nonresident or dead, proof of the handwriting of the witness or the maker before the clerk of the superior court of the county where the deed is to be registered shall be sufficient evidence of execution to admit the deed to registration. A deed in which the spaces in the attestation clause left blank for the date were never filled in was admitted to probate and registration on affidavit that the affiant was familiar with the handwriting of the grantor and verily believed that the signature on the conveyance was that of the grantor. The certificate of probate did not certify that the grantor and subscribing witness were dead at the time of the probate, but the evidence clearly showed that fact, and that the deed was probably then over 35 years old. *Held*, that failure of the certificate to recite that the maker and attesting witness were dead did not render the registration of the deed improper, for those jurisdictional facts will be presumed.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 151–159; Dec. Dig. ⊂⇒29.]

6. INFANTS ⊂⇒112—JUDGMENT—COLLATERAL ATTACK—SERVICE OF PROCESS.

At the time a judgment was rendered, which was before the adoption of the North Carolina Code of Civil Procedure, the courts had jurisdiction in actions against infants, without service of process on them, to appoint a guardian ad litem for them and proceed to judgment. The record of the suit which was one against infants recited that their general guardian accepted service. *Held* that, in view of the power of the court, the judgment could not be collaterally attacked many years later on the ground that the court was without jurisdiction because there was no valid service on the infants.

[Ed. Note.—For other cases, see Infants, Cent. Dig. § 320; Dec. Dig. ⊂⇒112; Judgment, Cent. Dig. §§ 941, 961, 962.]

7. EVIDENCE ⊂⇒82—PRESUMPTIONS—REGULARITY.

Where the records of a county were in such confusion that it was practically impossible to find many of them, the courts will of necessity for the protection of titles of purchases dependent on deeds made on judicial sale, indulge presumptions of regularity in procedure, where it appears

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that the court making the order of sale or rendering the judgment had jurisdiction of the person and subject-matter.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 104; Dec. Dig. ⊛82.]

8. EXECUTORS AND ADMINISTRATORS ⊛349(2)—SALES TO PAY DEBTS—JUDGMENT—"VENDITIONI EXPONAS."

Act 1784 (Rev. St. N. C. c. 63, § 1) gave creditors of deceased debtors whose personalty had been exhausted the right to sue out scire facias summoning the heirs to show cause why execution should not issue against lands descending, while Act 1789 (Rev. St. c. 63, § 8) provides that, if the estate of a deceased person be indebted to the administrator and there shall not be personal assets sufficient to pay such debts, it shall be lawful for such administrator to file a petition against the heir at law setting forth the nature of the debt and praying that the heir be made defendant, on which petition execution may issue against the lands of a deceased debtor. Laws 1846–47, c. 1, repealed Rev. St., c. 63, allowing creditors of deceased persons to subject by scire facias, to payment of their debts lands descending. After this act went into effect, the administrator of the estate of a deceased person filed a petition setting up that decedent was indebted to him, that the personalty was exhausted, and praying that the heirs be made parties and execution issue against lands descending to the heirs. The court, pursuant to the prayer, found the amount of the debt and directed that the same be paid from the lands descending to the heirs. The record recited, "Issue venditioni exponas. Issd.," and further showed an account of a sale by the administrator agreeably to the petition filed. *Held*, that the deed of the administrator is not subject to attack on the theory that the judgment did not authorize the sale, for the expression "venditioni exponas" may be translated, "You expose to sale," and therefore, as the title of a purchaser, at judicial sale will be protected without regard to the regularity of the procedure where the court had jurisdiction, the use of the Latin phrase which was common in olden times will not defeat the deed.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1449–1455; Dec. Dig. ⊛349(2).

For other definitions, see Words and Phrases, First and Second Series, Venditioni Exponas.]

9. EJECTMENT ⊛86(3)—RIGHT TO RECOVER—PROOF.

Where plaintiff established a paper title under grant from the state showing himself to be seised of one-half of a parcel of lands, plaintiff cannot recover the whole without deraigning a superior title or showing an ouster followed by adverse possession ripening into title, while defendant to recover must deraign superior title or establish an adverse title.

[Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 239, 244; Dec. Dig. ⊛86(3).]

10. ADVERSE POSSESSION ⊛95—EVIDENCE—WEIGHT.

The listing of lands for taxation and payment of taxes, while a circumstance to be considered in determining ouster and adverse possession, is of little if any weight to establish ouster and adverse possession until there is a showing of actual ouster and possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 530–532; Dec. Dig. ⊛95.]

11. ADVERSE POSSESSION ⊛13—TEST.

The test of adverse possession is the exposure of the occupant to an action of ejectment.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 67–76; Dec. Dig. ⊛13.]

---

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. ADVERSE POSSESSION ⊜⟹13—NATURE OF POSSESSION—ESSENTIALS.

To establish adverse possession, there must be actual occupancy, clear, definite, positive, and exclusive, during the whole statutory period with an intent to claim title to the land occupied.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 67–76; Dec. Dig. ⊜⟹13.]

13. ADVERSE POSSESSION ⊜⟹14—RUNNING OF STATUTE—OUSTER.

Defendant claimed title to a portion of a timber swamp, but the boundaries given in his conveyance were so vague that the limits could hardly be ascertained. He listed the land for taxation and paid taxes thereon. Thereafter through his agent he placed notices on trees upon the land warning trespassers and asserting his ownership, and similar notices were posted on the courthouse door and at the post office. Subsequently through an agent defendant took possession of the land. *Held*, in view of the nature of the land which was not susceptible of cultivation and of no use but for timber, defendant did not enter into adverse possession until he took actual possession through his agent.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 77–81; Dec. Dig. ⊜⟹14.]

14. EJECTMENT ⊜⟹115—RECOVERY OF UNDIVIDED INTEREST.

In ejectment for land, plaintiff is entitled to possession of the whole upon establishing title to an undivided one-half interest, where defendant is shown to have no title whatsoever; for one tenant in common may sue and recover the entire property against one claiming adversely to himself and his cotenant.

[Ed. Note.—For other cases, see Ejectment, Cent. Dig. §§ 373–407; Dec. Dig. ⊜⟹115.]

At Law. Action by the Richmond Cedar Works against R. S. Stringfellow and another. Judgment for plaintiff.

Ward & Thompson, of Elizabeth City, N. C., and Winston & Biggs, of Raleigh, N. C., for plaintiff.

Aydlett & Simpson, of Elizabeth City, N. C., and Mark Majette, of Columbia, N. C., for defendants.

CONNOR, District Judge. [1] Plaintiff shows title out of the state by grant No. 687 to Josiah Collins, July 9, 1796. It then introduced certified copy of a deed from Collins to Richard Davis, March 11, 1789. The certified copy contains the following words:

"Be it known that I, Josiah Collins, Allen and Dickinson, of Edenton, county of Chowan, and state of North Carolina, for and in consideration (seven lines belonging to this deed cannot be copied, it is torn so badly) Josiah Collins Allen Dickinson line." (A description by metes and bounds covering 2½ pages, and concluding:) "Containing sixty thousand acres be the same, more or less, being the land granted by his excellency, Samual Ashe, to the aforesaid Josiah Collins by patent No. 587, being dated 9th day of July, 1796. To have and to hold the said piece or parcel of land with all ways, woods, waters and every other appurtenance thereunto belonging or appertaining to the said Richard Davis, his heirs and assigns forever."

Then follows the usual covenant of warranty to the said Richard Davis. The probate, September term, 1809, Tyrrell county court, is in the following words:

"This deed of sale for land from Josiah Collins, Sr., to Richard Davis, Esq., was proved in open court by the oath of Thos. Trotter ordered to be registered."

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Thos. Trotter and James Haskins were the attesting witnesses. It was registered December 29, 1809. This copy was certified March 27, 1914. Plaintiff also introduced a copy of the same deed certified by W. H. Cooper, P. R., September 26, 1887, in which the lines referred to as being torn, in the other certified copy, are found. They are:

"Of the sum of two hundred and fifty dollars current money to me in hand paid by Richard Davis of the county of Tyrrell, state of North Carolina, at and before the sealing and delivery of these presents, the receipt and payment whereof is hereby acknowledged, have bargained, sold, aliened, enfeoffed and confirmed and I do hereby bargain, sell, alien, enfeoff and confirm unto the said Richard Davis, his heirs and assigns, a certain piece or parcel of land lying and being in the county of Tyrrell on the east side of Lake Phelps, south side of Scuppernong river, on the west side of Great Alligator river. Beginning at a pine in Allen Collins and Dickerson's line, etc."

This certified copy was admitted to probate and registration September 27, 1910, upon the affidavit of J. L. Cooper, who testified that he was the brother of W. H. H. Cooper, who was then dead, and was, at the date of the certificate, register of deeds of Tyrrell county. Plaintiff insists that section 988, Rev. 1905, authorized the registration of the certified copy. I am of the opinion that enough appears on the certified copy to show that the original was a perfect deed of conveyance from Josiah Collins to Davis. The habendum, which is complete, read in connection with that portion of the record which was not torn, shows that it was, before being torn, the registration of a deed from Collins to Davis. The certificate of probate made in open court expressly states that it was a perfect deed. To reject the overwhelming evidence in respect to this deed, 107 years after its registration, would be to make a precedent which, if followed, would endanger the title to innumerable tracts of land in this state. Whether or not the certified copy of September 26, 1887, was entitled to registration, the evidence is plenary and uncontradicted that it was a true and correct copy of the record in its then condition. The mutilation of the record evidently took place since 1887.

On March 27, 1809, Richard Davis conveyed a portion of the same land, covering the locus in quo, to Elisha Hassell.

[2] Plaintiff introduced certified copy of a deed, bearing date June 12, 1809, reciting that Elisha Hassell had sold to Joseph Hassell the land described in the deed. In the attestation clause the name of the grantor is written "Elijah Hassell," and the signature "Elijah Hassell" —he makes his mark. On the certified copy is the following indorsement: "And further by these present I, the said Elijah Hassell, do hereby forever warrant and defend," etc. This purports to be signed "Elisha Hassell." The same witnesses attest both signatures. The deed was proven in open court, June term, 1809, upon the oath of James Hassell, one of the attesting witnesses. It will be noted that in a deed from Joseph Hassell to Solomon Hassell, dated August 22, 1809, in which he conveys a tract of land, of which, after giving a specific description, he says:

"Which I have sold this day out of the deed, which I bought of Elisha Hassell, which is out of the Josiah Collins patent, No. 687."

On the certified copy of the deed from Richard Davis to Elisha Hassell is indorsed the following:

"Know all men by these present, that I. Elisha Hassell, for and in consideration of the sum of one hundred dollars to me in hand paid by Joseph Hassell, have given and granted unto said Joseph Hassell all of my right of the within deed. Signed and delivered in the present June 12, 1809.

"Elisha Hassell. [Seal.]"

This indorsement is attested by James Hassell, who also attested the signature to the deed of the same day, June 12, 1809. In view of the similarity in the two names, it is manifest that either the person who wrote the name of the grantor incorrectly spelled it, or the register incorrectly copied it in recording the deed. I find no difficulty in reaching the conclusion that the deed was, in truth, executed by Elisha Hassell. The next deed introduced by plaintiff is from Joseph Hassell to Solomon Hassell, bearing date August 22, 1809, recorded September 22, 1816. It is not denied that this deed covers a portion, which is located by the surveyor, of the Josiah Collins patent, No. 687, including the land in controversy.

It appears from the next deed introduced that Solomon Hassell on November 4, 1813, sold to Jesse Alexander a portion of the land conveyed to him by Joseph Hassell. The deed, after setting out the boundaries, concludes:

"Containing six hundred acres, more or less, which I have sold out of a deed I bought of Joseph Hassell, which was out of the Josiah Collins patent, No. 687."

This deed is recorded October 5, 1819, and covers the land in controversy.

[3] Plaintiff introduced Mrs. Ellen Davenport, the granddaughter of Jesse Alexander, who testified that he died leaving surviving five children, Joseph, George, Thomas, Abner, and Martha. Plaintiff shows certified copy of deed from George Alexander to Thomas Alexander bearing date January 7, 1832, conveying "one-fifth part of a swamp lying in Gum Neck and the swamp my father bought of Solomon Hassell," recorded March 17, 1832. There is no evidence tending to show that Jesse Alexander left a will—and is, therefore, presumed to have died intestate. The land conveyed to him, by Solomon Hassell, therefore, descended to his children, and, by the deed from George to Thomas, the latter became the owner of two-fifths undivided interest, leaving outstanding in his other children three-fifths.

[4] Thomas Alexander conveyed, September 21, 1832, the land by same description contained in the deed from Solomon Hassell to Jesse Alexander, to William Cahoon. This deed is recorded September 7, 1833. Plaintiff introduces deed from William R. Cahoon to James S. Cahoon, bearing date October 20, 1839, conveying the land as described in the deed from Joseph Hassell to Solomon Hassell. This deed is recorded September 6, 1845. Defendants insist that, in the absence of any evidence that William Cahoon and William R. Cahoon are the same person, the court cannot find the fact. It will be noted that there was an interval of seven years between the two deeds.

There is no evidence tending to show the death of William Cahoon, nor was there any evidence that any other person known as William Cahoon owned the land described in the deed. I think that it is a reasonable conclusion that William R. Cahoon is the same person to whom Thomas Alexander conveyed the land.

[5] Plaintiff introduced a certified copy of a deed from Jordan L. Jones, administrator of J. S. Cahoon, to Charles M. McClees, conveying the land by the same description contained in the deed from Solomon Hassell to Jesse Alexander, containing 600 acres more or less. Defendants attack this deed for a number of reasons. In the attestation clause the spaces left by the draftsman for the date are blank. Charles A. Truitt is the attesting witness. It was admitted to probate on December 22, 1885, on the affidavit of B. Jones, in which he states that he was personally acquainted with J. L. Jones, "the party whose name appears to be the same, and was acquainted with his writing, having often seen him write and having seen a great deal of his writing, and verily believes that the signature of the maker thereof is in the proper handwriting of the said J. L. Jones." The deed was ordered to registration, upon this affidavit by T. L. Jones, clerk superior court of Tyrrell county. Defendants insist that the certificate of probate is insufficient because it does not comply with the provisions of the statute then in force in this state.

Section 1246, subd. 8, Code 1883, provides that, when the subscribing witness is a nonresident or dead and the maker shall also be a nonresident or dead, proof of the handwriting of the witness, or that of the maker, before the clerk of the superior court of the county where the deed is to be registered, shall be sufficient evidence of the execution thereof to admit the deed to registration. The defendants insist that the clerk should have found, as a fact, and so certified, that the maker and subscribing witness were dead at the time he took the probate. The statute does not require that the certificate of the clerk shall contain a finding that the maker, or witness, are dead. In Cochran v. Improvement Co., 127 N. C. 386, 37 S. E. 496, Judge Furches reviewed the decisions of the Supreme Court of this state bearing upon the sufficiency of certificates of probate of deeds, reaching the conclusion that the court would presume that the jurisdictional facts existed. This case has been repeatedly affirmed and may be regarded as the settled law of this state. Brown v. Hutchinson, 155 N. C. 205, 71 S. E. 302; Lumber Co. v. Branch, 158 N. C. 251, 73 S. E. 164. While the deed does not show the date upon which it was executed, it contains recitals, to which specific reference will be made, which clearly show that it was executed as early as 1850. It was probably 35 years of age when admitted to probate. It was shown in evidence that the maker died during the year 1854, and the witness Truitt died 1879 or 1880. There can be no doubt that, at the time the probate was taken, the jurisdictional conditions existed. It would be trifling with the property rights to reject the certified copy of the deed. The certified copy from the office of the register of deeds of Tyrrell county is admitted.

[6] The other objections to the validity of deed invite a careful

consideration of its recitals and the record evidence relied upon to sustain it. It appears that at the January term, 1849, of the court of pleas and quarter sessions of Tyrrell county, Jordan L. Jones, by his attorney, Hon. R. R. Heath, exhibited a petition setting forth that he was administrator of the estate of J. S. Cahoon, deceased. The record of the court, April term, 1848, shows his appointment and qualification. He alleges: That the estate of his intestate is indebted to him in the sum of $110.75. That the personal property, and rights and credits, of his intestate have been exhausted in the payment of debt; that he died seised and possessed of real estate, which descended to his two children, who were his heirs at law, "Sarah Ann and Elizabeth Cahoon, both of whom are infants in ward to one Jesse Sikes duly appointed by Tyrrell court, the county of their domicile. That he is advised he is entitled to satisfaction of his claim against his intestate's estate out of the realty descended, and he therefore prays his debt may be ascertained and decreed, that execution may issue against the lands descended, therefor, and to that end that process may issue to said heirs compelling them to appear and answer," etc. At the January term, 1849, of the court, the following entries appear on:

The "Appearance Docket, No. 42, Heath—Jordan L. Jones, Admr. v. Cahoon Heirs. Service accepted. It appearing to the court that the estate of James S. Cahoon is indebted to petitioner in the sum of $110.75, judgment for said sum and interest from this date is granted to be raised from the lands with costs, descended to defendants from James L. Cahoon. Issue Venditioni Exponas. Issd."

At the April term, 1849, the case is found on the execution docket. No entry appears showing what, if anything, was done. The record shows:

An "account sales of J. L. Jordan the lands of Jas. S. Cahoon deed—sold on a credit of six months on the 21st day of April, 1849, agreeable to a petition filed at January term, 1849, by administrator."

Among other tracts, the account sale shows: "The Alexander tract on east of Armstrong bridge. Charles McClees $75.00." The deed recites that:

The land was sold "at Ashbee's store in Gum Neck, after advertising the same at the court house door and several other places in said county when and where Charles McClees came and bid the sum of seventy-five dollars and no one bidding a higher price, the following tract of land was struck off to him, the said Chas. McClees," etc.

Defendants insist that it appears from the record that no process was issued or served upon the heirs at law of James L. Cahoon, or their guardian, that therefore the court did not acquire jurisdiction of their persons, and that the judgment rendered in the cause is void. Upon the back of the petition the following entry is found:

"Jordan L. Johnson, Administrator of Cahoon, v. Cahoon Heirs.
"Service accepted.                              Jesse Sikes, Guardian."

The entry on the docket was evidently taken from this indorsement and constituted a judicial recognition of its validity.

In Matthews v. Joyce, 85 N. C. 258, it was held that in a petition in the county court, prior to the adoption of the Code of Civil Procedure, against infants, the court had the authority, without service of process upon them, to appoint a guardian ad litem for them, and proceed to judgment. In that case it appears that Judge Dillard and Judge Settle were referees. Judge Ruffin was of counsel. The concurrence of these lawyers, all whom, besides long and distinguished careers at the bar, served on the Supreme Court bench, with the opinion of Chief Justice Smith, writing for a unanimous court, of which Judge Ashe was the associate, gives to the decision more than ordinary weight. Judge Smith, after stating that the practice followed in that case "has long and almost universally prevailed in this state, and this power of appointment has been generally exercised without the issue of process, for the reason that no practical benefit would result to the infant from such service on him, and the court always assumed to protect the interests of such party, and to this end committed them to the defense of this Special Guardian." Rackley v. Roberts, 147 N. C. 201, 60 S. E. 975; Insurance Co. v. Bangs, 103 U. S. 435, 26 L. Ed. 580. If the court, under the practice prior to the Code of Civil Procedure, had the power to appoint a guardian ad litem, for the infant defendants, without process being served, it would seem clear that it could proceed to judgment when the infant appears by a general guardian who comes in and "accepts service"—voluntarily submits to the jurisdiction of the court. As said by Judge Smith, to declare judgments, under such conditions, void, "would be to establish a rule subversive of much judicial action, unsettling titles dependent thereon, and introducing distrust and confusion in regard to the tenure of estates, the injurious consequences of which can hardly be foreseen or estimated, and we do not feel at liberty, after so long delay, to disturb the decree on this ground." In that case, a direct attack was made on the decree by those who were affected by it; here, the attack is collateral and by a stranger to the title. There, the decree attacked was rendered during the year 1867 and the action was tried in 1879; here, the judgment was rendered 67 years ago. The court acquired jurisdiction, and its judgment cannot be called into question at this time.

[7, 8] It is, however, insisted that, if it be conceded that the court acquired jurisdiction, it did not render a judgment authorizing the administrator to sell the land. If the judgment is erroneous, it is conceded that it cannot be attacked collaterally; but if, as insisted by defendants, the judgment did not authorize the sale of the land by the administrator, his action in that respect is, of course, absolutely void. There is some apparent confusion in the language used by the counsel who conducted the proceeding. The judgment subjects "the lands descended" to sale for the payment of the amount found due the administrator, but, instead of directing the sale by the administrator, orders the issuance of a writ of venditioni exponas; and the docket entry shows that it was issued. It appears that J. L. Jordan, the administrator, was at that time sheriff of Tyrrell county. The Act of 1784, R. S. c. 63, § 1, gave to the creditor of a deceased debtor, whose personalty had been, upon a plea of fully administered, by the personal

representative, found to have been exhausted, the right to have a writ of scire facias summoning the heir to show cause why execution should not issue against the lands descended in his hands, etc. The Act of 1789, section 8 of the same chapter, Rev. Stat., provides that, if the estate of a deceased person is indebted to the administrator, and there shall not be personal assets sufficient to pay such debt, that it should be lawful for such administrator to prefer a petition in the county court, against the heir at law, setting forth the nature of the debt and praying that the heir be made defendant, and if, upon the hearing, "a decree be made against such heir or heirs and devisee or devisees, or any of them, execution shall and may issue against the real estate of the deceased debtor, in the possession of such heir, etc." At the session of the Legislature 1847 (Laws 1846–47, c. 1), this chapter of the Revised Statutes was repealed and a new method of subjecting the lands of deceased debtors, in the hands of heirs or devisees, prescribed. The last section of the act expressly repeals all laws and clauses of laws which allow creditors of deceased persons to subject the lands descended by scire facias, etc. The provisions of the act applied to all administrations granted subsequent to February 1, 1847. It is manifest that neither counsel nor clerk were very familiar with the new statute.

It will be observed that, in the method of procedure prescribed by this statute, no difference is made between debts due the general creditors and the administrator; but, in all cases where the goods and chattels were insufficient to pay all his debts, with the charges of administering the estate, the administrator was required to file a petition, setting forth the amount of the debts and the charges of administration. He was also to set forth a description of the lands, the heirs were to be made parties and served with notice "as in other petitions," and thereupon if the facts were found to be true, as alleged, the court was directed to make an order directing the sale, etc. The facts set forth in the petition filed by Jordan L. Jones, administrator, while not so full as required by the statute, complied substantially with its provisions—certainly containing those allegations which were essential to confer jurisdiction upon the court. The heirs were parties and, as we have seen, came into court by their guardian. The court found the amount of the debt and directed that the "sum be raised from the land descended to defendants from James S. Cahoon." The criticism of the judgment is in that it directed that a venditioni exponas issue. By a literal translation, these words mean, "You expose to sale." The writ known by that name is one which directs the sheriff to expose to sale lands or goods upon which he has theretofore levied a writ of fieri facias, and returned it into the court. As we know, formerly, in noting pleadings and docket entries, Latin terms, abbreviated, were in general use by lawyers and clerks. Doubtless, in proceedings under the statute in force prior to 1847, the attorney, or the clerk, noted the action and orders of the court, by using the words "Sci Fi" and, upon its return, "Ven Ex," all of which was well understood by them. It is no strained construction of the term used to give to it the meaning which it is manifest was given by the administrator, as shown by

the recitals in the deed—an order to sell the lands of his intestate for the purpose of making assets, etc. He did not refer to it as a "writ," but as an order "upon a petition filed." Acting in his capacity as administrator, and in accordance with the prayer of his petition, he exposed the land to sale—what he asked the court to permit him to do, and what the court manifestly gave him license or permission to do, as the statute authorized and directed. This is further shown by the account of sale made and returned to the court in which he says that he sold the land "on a credit of six months agreeable to a petition filed."

Defendants insist that the deed cannot be sustained because no order of sale, nor report, nor order confirming the sale, is shown. It is undoubtedly true that, upon both the reason of the thing, and decided cases, the law requires that one claiming under a deed, made pursuant to a judicial proceeding, show the record of the proceeding or account for the failure to do so. There is evidence tending to show that search was made in the clerk's office for the papers, orders, etc., and that the only paper found was the petition which was put in evidence. There is abundant evidence that the records of the court of Tyrrell county, prior to the Civil War, and the change in the system of courts and procedure, are in much confusion, and that it is practically impossible to find many of them. The courts, of necessity, for the protection of the title of purchases dependent upon deeds made by sheriffs, administrators, or commissioners, indulge presumptions of regularity in procedure, when it is shown that the court making the order of sale or rendering the judgment had and entertained jurisdiction of the person and the subject-matter. Grignon's Lessees v. Astor, 2 How. 319, 11 L. Ed. 283. It is also uniformly held by the courts of this state and the Supreme Court of the United States that, when it appears that the court in which the order of sale was made had jurisdiction, the title of the purchaser at such sales will be protected, without regard to the regularity of the procedure. In Brown v. Coble, 76 N. C. 391, it is held that, after the payment of the purchase money for land sold under a decree of the court, an order of such court is not necessary to enable the master to make a valid deed to the purchaser. In Rackley v. Roberts, 147 N. C. 201, 60 S. E. 975, Walker, J., says:

It is "the general doctrine, settled by this court, * * * that, when there is a purchaser under an order or judgment, the purchaser need only to inquire if upon the face of the record the court apparently has jurisdiction of the parties and the subject-matter, in order to be protected, provided he buys in good faith and without notice of any actual defect"—citing a large number of decisions of the court.

In that case no process was served on the infant defendant before the appointment of the guardian ad litem; the court held that the title of the purchaser was protected by the judgment. Yarborough v. Moore, 151 N. C. 116, 65 S. E. 763, wherein Judge Walker again reviews the authorities. In Comstock v. Crawford, 3 Wall. 396, 18 L. Ed. 34, Judge Field says:

"The proceeding for the sale of the real property of an intestate, though had in the general course of administration, is a distinct and independent pro-

ceeding authorized by statute only in certain specially designated cases; but, when by the presentation of a case within the statute the jurisdiction of the court has once attached, the regularity or irregularity of subsequent steps can only be questioned in some  * * * mode prescribed by law. They are not matters for which the decrees of the court can be collaterally assailed."

Reference to the records of this court, and the state courts, discloses an amount, and character, of litigation involving the validity of title to the timber or swamp lands in this state, together with the unsatisfactory and incomplete records, which illustrate the wisdom, if not necessity, of resorting to presumption of regularity of judicial procedure in the courts, conducted frequently a century ago. The lands were usually of small value and incapable of other than constructive possession. The manner in which the judicial records were made and preserved render it necessary, for the protection of titles, that the courts indulge in presumptions that, however imperfect in form and state of preservation, they import verity. This record is a striking illustration of this necessity. I am of the opinion that the deeds and records introduced by the plaintiffs show a connected paper title to the interest which Thomas Alexander conveyed to Jas. S. Cahoon in the land in controversy.

Plaintiff introduced record of special proceedings in the superior court of Tyrrell county, instituted August 26, 1893, by the heirs of Chas. McClees for sale for partition, in which, pursuant to decrees made therein, the land in controversy, together with several other tracts, were sold and conveyed by M. Majette, commissioner, to C. R. Johnson, November 10, 1893. Johnson conveyed to Richmond Cedar Works, October, 1905. One of Jesse Alexander's children died intestate and without issue.

[9] Unless the title thus acquired by plaintiff has been divested by some superior paper title, or by an ouster followed by adverse possession of sufficient length of time to bar plaintiff's action, it is entitled to one-half undivided interest in the 600 acres described in the complaint. Plaintiff introduced evidence which, it is argued, entitles it to recover the entire tract upon a different chain of title. Having shown title out of the state and in itself, it can only recover, in this action, by showing either a grant prior in date to the Josiah Collins grant, No. 687, or an ouster, followed by adverse possession, ripening into title, and showing that it owns such title. This, it has failed to do. Its right to recover is dependent upon the paper title which it has shown.

Defendants can resist the plaintiff's recovery by showing a superior legal or paper title, or by showing color of title in themselves or those under whom they claim, followed by an ouster and seven years' adverse possession. Defendant Armstrong does not claim to have title. He was in possession of the land in controversy as the tenant of his codefendant, R. S. Stringfellow.

Defendant Stringfellow claims under the following paper title:

(1) Deed from Cahoon and others, children of Gilbert Cahoon, to Z. F. Owens, January 9, 1885.

(2) Z. F. Owens to G. W. Rowland, March 6, 1885.

(3) G. W. Rowland to H. C. Walker, July 18, 1888.

(4) G. W. Rowland to Mrs. S. Stringfellow, 1889.

(5) Mrs. Mary S. Stringfellow to defendant R. S. Stringfellow, April 27, 1896.

(6) Defendant also introduces a deed from Roughton to himself, December 14, 1909.

An action was brought by plaintiff against defendant for the recovery of the land in controversy, December, 1911, in which plaintiff at ——— term, 191—, submitted to a judgment of nonsuit, and on November 25, 1914, being within one year thereafter, brought this action. Defendant does not connect himself with the title, originating with Josiah Collins, nor any of those persons claiming under, or through, him, or a grant prior to that to Josiah Collins. His claim to ownership is based upon an ouster and an alleged adverse possession of seven years. While the description contained in the deeds under which defendant claims is very indefinite, it may be taken that it is sufficient to enable the location of the land, as surveyed by Mr. Basnight, 1910, and covers the land in controversy.

[10] We are thus brought to a consideration of the determinative question, upon the decision of which the conflicting contention of the parties to this action depends. It is conceded that the land is low, swampy soil, covered by a growth of pine, juniper, and cypress, not capable of cultivation, and valuable only for the timber on it. It is a part of a large swamp of several thousand acres. Prior to the survey made by Basnight, for defendant, it had not been surveyed, and there were no marked lines or boundaries upon, or around, it. There is no sufficient evidence of an ouster and possession by those under whom defendant claims.

For the purpose of showing adverse possession, defendant introduced evidence in regard to: (1) Listing and payment of tax on the land. (2) Posting notices warning trespassers to keep off. (3) Building and occupying a small cabin on the land. (4) Cutting trees.

I have given the evidence a careful examination and consideration. The payment of taxes by the agent of Mrs. Stringfellow, prior to 1896, the date upon which she conveyed to defendant, is of but little probative value as evidence of an ouster or possession. The latest expression of opinion as to the effect of payment of tax on land, as evidence of adverse possession, is found in Christman v. Hilliard, 167 N. C. 4, 82 S. E. 949, where Judge Walker says:

"The listing of the land and payment of taxes is a relevant fact, in connection with other circumstances, tending to show a claim of title and an adverse or hostile possession, though not sufficient by itself for the purpose."

In this case, listing and paying taxes on the land prior to the time that notices were posted and the cabin built thereon should be given but little, if any, weight, for the purpose of showing an ouster and possession. The land in controversy is a small portion of a large timber swamp. There was nothing on or around the land to show the metes and bounds of defendant's claim; and, until 1910, it does not appear that any survey had been made or any act directing attention to the extent of the claim to the land. Nothing appeared on the tax book indicating the location or extent of defendant's claim. Mr.

Stringfellow paid taxes on the land after the execution of the deed to him in 1896.

[11-13] The test of adverse possession is the exposure of the occupant to an action of ejectment. Christman v. Hilliard, supra. The standard, by which the claim of the defendant Stringfellow that he has acquired title by adverse possession is to be measured, has been frequently fixed by the court. In one of the latest decisions, it is said:

"To establish adverse possession, there must be actual occupancy, clear, definite, positive, and exclusive during the whole statutory period and with an intention to claim title to the land occupied." Bland v. Beasley, 145 N. C. 168, 58 S. E. 993.

"Possession necessary to give title to land by limitations is a possession under color, taken by a grantee in person or by his agents, and held and claimed continuously to the boundaries of the deed, without interruption or relinquishment, for seven years." Haddock v. Leary, 148 N. C. 378, 62 S. E. 426.

There can be no doubt that Mr. Stringfellow in good faith claimed to own the land in controversy; he honestly believed that his title was valid. He paid taxes on it, and during the year 1907 had his agent, Mr. Armstrong, to build a small house or cabin on it, built of logs cut from the land. Armstrong occupied it at night, with more or less regularity, kept the door locked, and left his cooking utensils and furniture in it. This was done for the purpose of claiming and asserting ownership and was notice to the holder of the legal title of his claim. At some time (the exact date is uncertain, but, so far as it can be fixed, during the year 1905), Mr. Stringfellow, who resides in Alabama, caused to be printed on pieces of cloth warning to trespassers, and had Mr. Armstrong, his agent, to post, or tack, them upon trees on different parts of the land. The words were printed on "a thin piece of duck"—cloth. One was posted or tacked upon the courthouse door in Columbia. During the year 1909, the first notices having become worn or defaced by the weather, Mr. Stringfellow had the notice printed upon thicker or heavier cloth and posted on the trees and at the post office. The notices forbade people from "trespassing or hunting" on the land.

Assuming that the several assertions of possession by Mr. Stringfellow, combined or connected, constituted an ouster and were the exercise of such dominion or use of the land of which it was capable, and that they began with the posting of the first notices, 1905, and continued up to the time the first action was instituted, December, 1911, the period of time is not sufficient to ripen such possession into title. I think it doubtful, however, whether there was any ouster or adverse possession until the cabin or house was built in 1907. It is doubtful whether simply posting notices warning trespassers and hunters from going upon swamp land, with no suggestion of its boundaries, constitutes possession. There was no actual occupancy of any portion of the land, nor were there any metes and bounds marked or indicated by which the extent of the defendant's claim could be ascertained. An examination of the deeds, under which he claimed, would have afforded but little information in respect to the

boundaries. It is painfully indefinite and uncertain. It was only by a most latitudinous construction that it was possible to make a survey. A large mass of evidence in regard to the location of the several divisions of Thicket Swamp, itself sufficiently indefinite, only tended to confusion and uncertainty. The confusion of boundaries, together with the almost numberless conveyances and the absence of well-defined marked lines, or water courses with distinctly marked banks or "runs," renders any conclusion which may be reached unsatisfactory.

It is reasonably certain that, for some reason, not very apparent, August 22, 1809, a tract of swamp land was conveyed by Joseph Hassell, "out of the deed which I bought of Elisha Hassell, which is out of the Josiah Collins patent, No. 687," containing 600 acres. This tract is located with reasonable certainty and is conveyed by the several deeds in plaintiff's chain of title. It is not very clear that defendant's deed covers this land, but there is sufficient evidence to indicate that it probably does. Assuming that it does, I am unable to find, nor is it seriously contended, that those under whom defendant claims acquired the Collins title. The claim therefore of the defendant must, of necessity, begin with an ouster and depend upon adverse possession. Giving to the principle that, in respect to lands of that character, possession may be acquired and continued by subjecting the land to the use of which it is capable, a most liberal interpretation and application, I am unable to find that such possession began prior to 1907, when the house or cabin was built, and thus continued for only four years before the first action was brought. A nonsuit having been taken and this action brought within one year thereafter, the plaintiff is not barred of its entry and action.

[14] The plaintiff, having shown title to one-half undivided interest, is entitled to be put into possession as against the defendant who shows no title to any interest. The rule is stated by Mr. Justice Avery in Gilchrist v. Middleton, 107 N. C. 663, 684, 12 S. E. 85, 92:

"One tenant in common of land may sue alone and recover the entire interest in the common property, against another claiming adversely to his cotenants as well as to himself, though he actually prove title to only an undivided interest. This he is allowed to do, in order to protect the rights of his cotenants against trespassers and disseisors." Allred v. Smith, 135 N. C. 443, 47 S. E. 597, 65 L. R. A. 924.

This action was instituted on the law side of the docket; but upon hearing the evidence it was manifest that, by reason of the complication of the boundaries and the large number of deeds introduced, it was impracticable to have the questions involved decided by the jury. The court found the facts.

A judgment will be drawn declaring that the plaintiff is the owner of a one-half undivided interest in the land described in the complaint. So far as appears from this record, the other one-half interest is outstanding in the heirs of Jesse Alexander, deceased. The cost will be divided between the parties, each party paying its and his witnesses, subpœnas, cost of service, and attendance; the remaining cost, including stenographer's allowance and court cost, to be divided equally.