STATE OF NORTH CAROLINA v. JOE C. BROOKS, SR., AND WIFE, ANNE BROOKS; THELMA B. McEACHERN, SINGLE; JIM BROOKS AND WIFE, ALENE W. BROOKS; FRANCES B. FURLONG, SINGLE; MARY BROOKS, SINGLE; LULA BROOKS, SINGLE

No. 43

(Filed 10 June 1971)

1. State § 2; Waters and Watercourses § 7— title to marshlands — burden of proof

    In an action instituted by the State of North Carolina to remove cloud on title to a certain tract of marshlands located on the coast, defendant claimants to the land had the burden of proof to connect their chain of title to the State's original grant of the marshlands in 1770.

2. Boundaries § 10— description in deed — insufficiency of description

    Description in a deed which merely referred to the property in question as "200 acres of the marsh and islands" that had been granted by a 1770 patent from the State, held patently and fatally defective.

3. Ejectment § 10; Trespass to Try Title § 4— break in chain of title

    Where there is a missing link in the claimant's purported chain of title, the chain is severed and no benefit can accrue from the earlier conveyances.

4. State § 2; Waters and Watercourses § 7— title to marshlands— statutory presumption of title in the State

    In an action instituted by the State of North Carolina to remove cloud on title to a certain tract of coastal marshlands, the State assert-

ing its title under an 1837 statute vesting it with title to all marshlands not previously conveyed, the title to the tract is conclusively presumed in the State as a matter of law, since the defendant claimants to the tract failed to connect their chain of title to the State's original grant of the tract in 1770. G.S. 146-79; Session Laws of 1955, Chapter 1372.

APPEAL by defendants from *Bone, E.J.,* April 1970 Civil Session of BRUNSWICK Superior Court, certified, pursuant to G.S. 7A-31(a), for review by the Supreme Court without prior determination in the Court of Appeals, docketed and argued as No. 42 at Fall Term 1970.

Plaintiff, the State of North Carolina, alleging it is the owner in fee simple and entitled to the immediate possession of a tract of land (marshlands) in Shallotte Township, Brunswick County, North Carolina, described below, instituted this civil action for trespass thereon by defendants; for the removal of a cloud on its title on account of an invalid claim thereto asserted by defendants; and for mandatory injunction requiring the removal of obstructions placed by defendants in the navigable streams.

Answering, defendants denied plaintiff's title; and, as a cross action, alleged they were the owners in fee simple of the described lands.

The tract of land referred to in the pleadings is described in the complaint as follows:

"BEGINNING at a stake in the north line of Sunset Beach approximately 1000 feet east of Tubbs Inlet, said stake being located north 24° 30′ west 703 feet from a stone located in the strand of Sunset Beach, M. C. Gore's corner; running thence 5350 feet to the northern edge of the Intra-Coastal Waterway; thence north 77° east 2365 feet to a point; thence north 82° 15′ east 1015 feet to a point; thence north 86° east 1500 feet to an iron pipe, Mary Brooks' corner; thence south 30′ west 5952 feet to an iron pipe; thence south 45° west 2120 feet to a point; thence south 75° west 640 feet to the BEGINNING point, containing approximately 447.21 acres, subject to the navigation easement of the United States of America within the right-of-way boundaries of the Intra-Coastal Waterway, excepting from this description, however, the island known as Simmons Island."

The case was first tried at October 1967 Civil Session before Hall, J., and a jury. The record of that trial, now a part of the records of this Court, discloses the following: Evidence was offered by both plaintiff and defendants. At the close of all the evidence, plaintiff moved for nonsuit of the cross action in which defendants alleged they owned the marshlands in controversy. The court overruled plaintiff's motion and submitted four issues, to wit: (1) Are the defendants the owners and entitled to possession of the lands described in the complaint, except that portion thereof covered by navigable waters? (2) Is the plaintiff, the State of North Carolina, the owner and entitled to immediate possession of the lands as described in the complaint? (3) If so, have the defendants trespassed on said land, as alleged in the complaint? (4) Have the defendants obstructed the navigable waters of the State of North Carolina as alleged in the complaint?

The jury answered the first issue, "Yes"; they did not answer the second and third issues; and they answered the fourth issue, "No."

Upon the verdict, the court adjudged that defendants were the owners of the lands described in the complaint except the portion thereof covered by navigable waters; and that, as stipulated, Still Creek, Simmons Creek, the Eastern Channel and the Cut Off Creek, portions of which are within boundaries of the tract of land described in the complaint, were navigable waters. Upon plaintiff's appeal, the Court of Appeals affirmed. 2 N.C. App. 115, 162 S.E. 2d 579.

This Court, upon review on *certiorari, reversed* that portion of the decision of the Court of Appeals which affirmed the portion of the judgment of the superior court which adjudged that defendants were the owners of the lands described in the complaint. This Court affirmed that portion of the decision of the Court of Appeals which adjudged that defendants had not obstructed the navigable waters of the State of North Carolina as alleged in the complaint. The cause was remanded for further proceedings in the superior court to determine whether plaintiff, the State of North Carolina, was the owner and entitled to the immediate possession of the lands described in the complaint. *State v. Brooks,* 275 N.C. 175, 166 S.E. 2d 70.

At the commencement of the second trial (presently under review), Judge Bone, after reciting the prior proceedings referred to above, entered a judgment in which the court "ORDERED, ADJUDGED AND DECREED that said counterclaim of the defendants be, and it is hereby, dismissed." Defendants excepted. Thereafter a jury was duly selected, sworn and impaneled to try the issue stated in this Court's order of remand.

Plaintiff offered evidence consisting solely of a stipulation and of the map referred to therein. The record shows: "It is stipulated by Counsel for the plaintiff and counsel for the defendants that the property in question is located south of Seaside between the mainland and Ocean Isle Beach, represented on a map of a survey of H. R. Hewett dated 14 April 1964, recorded in Map Book 8 at Page 33, records of Brunswick County, and further, the map illustrates and *locates* the lands in dispute." (Our italics.)

The evidence offered by defendants, consisting of testimony and documentary evidence, will be referred to in the opinion.

The court submitted one issue, to wit: "Is the plaintiff, the State of North Carolina, the owner and entitled to the immediate possession of the land described in the complaint?" The court instructed the jury peremptorily as follows: "(I)f you believe the evidence which has been offered here by both sides, and if you find the facts to be as all the evidence tends to show, then you should answer that issue, 'Yes.'" Notwithstanding, the jury answered the issue, "No."

Thereupon, the court entered the following judgment:

"This cause coming on to be heard and being heard, and after the return of the verdict herein, the Plaintiff having moved that the verdict be set aside and judgment be entered in accordance with Plaintiff's motion for directed verdict.

"AND IT APPEARING to the Court, and the Court finding as a fact that the verdict is contrary to the evidence and should be set aside, and it further appearing to the Court that the Plaintiff's motion for directed verdict should be allowed and that Judgment should be entered in accordance with Plaintiff's motion for directed verdict;

State v. Brooks

"Now, THEREFORE, it is ORDERED, ADJUDGED and DECREED that the verdict is set aside and Judgment is hereby entered in accordance with Plaintiff's motion for directed verdict;

"AND IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Plaintiff, the State of North Carolina, is the owner and entitled to the immediate possession of the property described in the Complaint.

"Let the defendants be taxed with the costs."

Defendants excepted and appealed.

*Attorney General Morgan, Assistant Attorney - General Rich, and George Rountree, Jr., and John Richard Newton, of counsel, for plaintiff appellee.*

*E. J. Prevatte for defendant appellants.*

BOBBITT, Chief Justice.

The allegations in their cross action did not disclose the basis on which defendants asserted ownership of the tract of land described in the complaint. When tried by Judge Hall, the case was submitted to the jury to determine whether defendants had acquired ownership by thirty years adverse possession under known and visible lines and boundaries. On appeal, the crucial question was whether defendants had offered evidence sufficient to withstand plaintiff's motion to nonsuit defendants' cross action. The Court of Appeals held the evidence was sufficient. This Court reversed that decision and in effect nonsuited defendants' cross action. The formal judgment to this effect by Judge Bone was not necessary but was appropriate. The exception to the entry thereof is without merit. The question now before us is whether plaintiff has established ownership of the described lands.

G.S. 146-79 in pertinent part provides: "In all controversies and suits for any land to which the State or any State agency or its assigns shall be a party, the title to such lands shall be taken and deemed to be in the State or the State agency or its assigns until the other party shall show that he has a good and valid title to such lands in himself."

Relying upon the quoted statutory provisions, plaintiff identified by stipulation and by map the tract of land in controversy and rested.

Defendants offered no evidence of adverse possession. They offered a grant dated April 9, 1770, signed "Wm. Tryon," from the State of North Carolina to "William Gaus." They offered various deeds which they contend connect them with the "Gause" grant. They offered testimony which they contend shows the land in controversy is included in the Gause grant and that all or part thereof is included in the various deeds in evidence.

In only two of the deeds offered by defendants is the land described in substantial accord with the description in the complaint and with the Hewett map. One is a deed dated August, 1967, from "ELIZABETH BROOKS, widow of Joseph William Brooks, ERIC BROOKS and wife, MARY ALICE, MAE B. ALBURY, widow, RUTH CREECH and husband, LONNIE, M. ROXIE NEWCOMER, widow, all heirs-at-law of Henry Gore, all of Dade County, Florida," to Joe C. Brooks, Sr., and wife, Ann Brooks. The other is a deed dated August 25, 1969, from "HENRY C. LONG and wife, AURIE M. LONG, of Tampa, Florida (the said Henry C. Long being an heir-at-law of the late Henry Gore)," to Joe C. Brooks, Sr., and wife, Ann Brooks. These two deeds were executed, acknowledged and recorded subsequent to the institution of this action, which was instituted on September 26, 1966. Seemingly, defendants now claim ownership by purchase from persons who purport to be heirs-at-law of Henry Gore.

[1] Assuming, without deciding, that the subject land is included in the Gause grant, defendants, in order to show they have a good and valid title to the subject land in themselves, must connect themselves with the Gause grant. They must carry the burden of proof "by showing a connected chain of title from the sovereign to (them) for the identical lands claimed by (them)." *Sledge v. Miller*, 249 N.C. 447, 451, 106 S.E. 2d 868, 872 (1959). Accord: *Gahagan v. Gosnell*, 270 N.C. 117, 119, 153 S.E. 2d 879, 880 (1967).

The land covered by the Gause grant is described therein as follows: "470 acres Brunswick being a tide marsh between Tubs Inlet and Mad Inlet joining and between Needham Gaus, John Simmons, *his own,* Peter Allston and Isaac Ludlams line, Beginning at a pine by the mouth of the Spring Branch on Peter Allstons line by the marsh side thence along with the up land and marsh joining Peter Allstons his own John Sim-

mons and Needham Gaus lines to a pine on the marsh side by Shelleys Point 12 poles to eastward of Need Gaus westermost corner which on a straight line is south 74 west 882 poles, thence south 120 poles to a stake by his beach tract; thence along said line or beach north 68 east 320 poles, thence north 76 east 560 poles to a stake by Tubs Inlet by the mouth of Morgans Creek; thence along by the side of said creek about north 49 east 40 poles to the Beginning." (Our italics.)

To show a connected chain of title from William Gause to them, defendants offered the following deeds:

1. A deed dated July 25, 1796, from William Gause to Samuel Gause which purports to convey "a certain plantation and tract of land" containing 610 acres, more or less, "that is to say, 110 acres on the Plead, also 200 acres *of* the marsh and islands Tubbs Inlet joining the above and granted by patent dated the 9th of April 1770 to said William Gause. Also 300 acres . . . . " (Our italics.)

2. A deed dated September 10, 1807, from Samuel Gause to William Tilly, which purports to convey "a plantation tract or parcel of land" containing 610 acres, more or less, "that is to say 110 acres on the head of the east branch of Little River granted by patent to John Ludlum the 26th day of May, 1757, 200 acres of the tide marsh and island near Tubbs Inlet, and joining the above, granted by patent bearing date 9th day of April, 1770, to William Gause." (Note: No reference is made to the additional 300 acres referred to in the deed from William Gause to Samuel Gause.)

3. A deed dated July 31, 1848, from Sterling B. Everett, Clerk and Master in Equity, to William Frink, which purports to convey a tract of land "near Shallotte and opposite Tubbs Inlet and known as the Tilly Place and Gold Plantation whereon Andrew L. Gold last resided and died, bounded on the south and west by the lands of William Frink, on the north and east by the lands of Henry Nutt, and on the south by the Atlantic Ocean, containing about 800 acres, more or less, . . . . " This deed recites that it was made pursuant to a sale under a decree of the Court of Equity of Brunswick County on petition of Eliza L. Gold, by her guardian and next friend, Bryan Gause, and Uriah Morse and wife, Margaret Ann Morse.

4. A deed dated June 7, 1853, from William Frink to Henry Gore which purports to convey a tract of land described therein as follows: "BEGINNING at a stake at the mouth of Roaring Branch run thence up said branch about North 16 West 140 poles to a pine; thence North 17 West 214 poles to a pine in a large swamp; thence South 53 West 168 poles to a red oak; thence North 1° 30' East 230 Poles to a gum in the mouth of Walling Branch; thence up said branch crossing the public road to a stake in the head of said branch; thence South 69 West 232 poles to a stake in William Frink's line; thence with his line South 24 East 640 poles to a stake on the marsh; thence to Simmons Creek; thence with said Creek to the main river; thence with said river to opposite the mouth of Roaring Branch; thence to the Beginning, containing 1062 acres, more or less, known as the Gold Land, . . . . "

Two instances of the failure to show a connected chain of title from William Gause to defendants are pointed out in the following numbered paragraphs:

[2] 1. The description in each of two deeds, namely, the deed from William Gause to Samuel Gause and the deed from Samuel Gause to William Tilly, is patently and fatally defective. The only relevant portion of the description in each of these deeds is the reference to 200 acres *of* the land granted on April 9, 1770, to William Gause. The principles applicable in determining the sufficiency of the description are well established. *Hodges v. Stewart,* 218 N.C. 290, 10 S.E. 2d 723 (1940), and cases cited therein. "The description must identify the land, or it must refer to something that will identify it with certainty. Otherwise the description is void for uncertainty." *Deans v. Deans,* 241 N.C. 1, 84 S.E. 2d 321 (1954). Accord, *Carlton v. Anderson,* 276 N.C. 564, 173 S.E. 2d 783 (1970). Parol evidence is admissible to fit the description to the land. G.S. 8-39. "Such evidence cannot, however, be used to enlarge the scope of the descriptive words. The deed itself must point to the source from which evidence *aliunde* to make the description complete is to be sought." *Self Help Corp. v. Brinkley,* 215 N.C. 615, 2 S.E. 2d 889 (1939). Accord, *Baldwin v. Hinton,* 243 N.C. 113, 119, 90 S.E. 2d 316, 320 (1955). Thus, in *Hodges v. Stewart, supra,* the devise of 25 acres out of the home tract of 82 acres, the land devised to include "the dwelling and outhouses," was held void for vagueness and uncertainty in the description of the property.

[3] 2. There is *at least* one missing link in defendants' purported connected chain of title. "Where a link is missing the chain is severed, and no benefit can accrue from the earlier conveyances." *Sledge v. Miller, supra* at 452, 106 S.E. 2d at 873. The validity of the deed from Sterling B. Everett, Clerk and Master in Equity, to William Frink, is predicated on ownership of the 800 acres, more or less, described therein, by Eliza L. Gold, Uriah Morse and Margaret Ann Morse, or by one or more of them. The record is silent as to how these persons or any of them acquired title. Thus, there is a hiatus or break between William Tilly and William Frink. *Lindsay v. Carswell,* 240 N.C. 45, 81 S.E. 2d 168 (1954) ; *Sledge v. Miller, supra; Bowers v. Mitchell,* 258 N.C. 80, 128 S.E. 2d 6 (1962).

[4] Since defendants have failed to show they have a good and valid title to the subject land in themselves, our next inquiry is whether title vests in plaintiff, the State of North Carolina, *as a matter of law* by virtue of G.S. 146-79.

With reference to plaintiff's claim of ownership, we take judicial notice of the statutory provisions set forth and discussed below.

Chapter XXIII, Laws of 1837, created "The President and Directors of the Literary Fund of North Carolina," a body politic and corporate, and vested in it and its successors, in trust, as a public fund for education and the establishment of common schools, "all the swamp lands of this State, not heretofore duly entered and granted to individuals . . . . " These provisions of the 1837 Act were codified as Sections 1 and 3, Chapter 67, Revised Statutes of 1837, and as Sections 1 and 3, Chapter 66, Revised Code of 1854.

Chapter 200, Laws of 1881, created the State Board of Education, a body politic and corporate, and provided that it "shall succeed to all the powers and trusts of the 'president and directors of the literary fund of North Carolina.' " The 1881 Act provided further that the State Board of Education "shall likewise succeed to and have all the property of every kind and use, powers, rights, privileges and advantages which in anywise belonged or appertained to the said 'president and directors of the literary fund of North Carolina,' and may, in its own name, assert, use, apply and enforce the same." These provisions of the 1881 Act were codified as Sections 2503 and

2506, Chapter 15, Code of 1883; as Sections 4030 and 4033, Chapter 89, Revisal of 1905; and as Sections 5384 and 5385, Chapter 95, of the Consolidated Statutes of 1919.

Article IX, § 9, of the Constitution of North Carolina, as amended by the electorate in the General Election of November, 1942, provides in pertinent part: "The State Board of Education shall succeed to all the powers and trusts of the President and Directors of the Literary Fund of North Carolina and the State Board of Education as heretofore constituted." (Note: The revised Constitution adopted by the electorate in the General Election of November, 1970, becomes effective on July 1, 1971.) Pursuant thereto, the General Assembly enacted Chapter 721, Session Laws of 1943, providing in pertinent part that the State Board of Education as constituted under Article IX, § 8, of the Constitution of North Carolina, as amended by the electorate in the General Election of November, 1942, "shall succeed to the title to all property, real and personal, and shall succeed to and exercise and perform all the powers, functions and duties . . . of the State Board of Education as constituted prior to the first day of April, one thousand nine hundred and forty-three, including the power to take, hold and convey property, both real and personal, to the same extent that any corporation might take, hold and convey the same under the laws of this State." These provisions of the 1943 Act were codified as Sections 115-19 and 115-19.1 of the General Statutes of 1943.

Chapter 1372, Session Laws of 1955, is entitled "AN ACT REWRITING, REARRANGING, RENUMBERING AND AMENDING CHAPTER 115 OF THE GENERAL STATUTES, AND REPEALING CERTAIN OBSOLETE SECTIONS THEREOF." Section 2, Article 2, Subchapter II, entitled "The State Board of Education," provides: "The powers and duties of the State Board of Education are defined as follows: 1. . . . . 2. Successors to powers of president of Literary Fund and to boards or commissions. The board shall succeed to all the powers and trusts of the president and directors of the Literary Fund of North Carolina; and to all the powers, functions, duties, and property of all abolished commissions and boards including the State School Commission, the State Textbook Commission, the State Board for Vocational Education, and the State Board of Commercial Education, including the power to take, hold and convey property, both real

and personal, to the same extent that any corporation might take, hold and convey the same under the laws of this State."

It appears from the foregoing that the title to swamp lands vested in "The President and Directors of the Literary Fund of North Carolina" by the 1837 Act and successive codifications thereof now vests in the State Board of Education. The title so vested related to "all of the swamp lands of this State, not heretofore duly entered and granted to individuals . . . . "

It has seemed appropriate to take notice of the statutes reviewed above in order to consider in proper historical perspective the statute now codified as G.S. 146-79.

Chapter XXXVI, Laws of 1842-1843, contains this provision: "Sec. 3. *Be it further enacted,* That in all controversies and suits at law, for any of the swamp lands in this State to which 'the President and Directors of the Literary Fund of North Carolina,' or their assigns shall be a party, the title to the said lands shall be taken and deemed to be in the said President and Directors of the Literary Fund of North Carolina, or their assigns until the other party shall shew, that he, she or they, have a good and valid title to the said lands in him, her or themselves." This provision of the Act of 1842-1843 is codified as Section 24, Chapter 66, Revised Code of 1854, which provides: "24. In all controversies and suits for any of the swamp lands, to which the said corporation ('The President and Directors of the Literary Fund of North Carolina') or their assigns shall be a party, the title to the said lands shall be taken and deemed to be in the corporation or their assigns, until the other party shall show that he hath a good and valid title to the said lands in himself."

Subsequent to the enactment of Chapter 200, Laws of 1881, referred to above, which created the State Board of Education, the quoted provision of the Act of 1842-1843 was codified as Section 2527, Chapter 15, Code of 1883, as follows: "In all controversies and suits for any of the swamp lands, to which the said board of education or their assigns shall be a party, the title to the said lands shall be taken and deemed to be in the said board or their assigns until the other party shall show that he hath a good and valid title to the said lands in himself." It is also so codified as Section 4047, Chapter 89, of the Revisal of 1905; as part of Section 7617, Chapter 128, of the Consoli-

dated Statutes of 1919; and as part of Section 146-90, Chapter 146, of the General Statutes of 1943 (Replacement 1958).

The statute now codified as G.S. 146-79 was enacted by Chapter 683, Session Laws of 1959, entitled, "AN ACT TO RE-WRITE CHAPTER 146 OF THE GENERAL STATUTES, ENTITLED 'STATE LANDS.'" G.S. 146-79 provides: "In all controversies and suits for any land to which the State or any State agency or its assigns shall be a party, the title to such lands shall be taken and deemed to be in the State or the State agency or its assigns until the other party shall show that he has a good and valid title to such lands in himself." The statute codified as G.S. 146-70, also enacted by the comprehensive 1959 Act, provides: "Every action or special proceeding in behalf of the State or any State agency with respect to State lands or any interest therein, or in respect to land being condemned by the State, shall be brought by the Attorney General in the name of the State, upon complaint of the Director of Administration." The complaint herein was verified by the Director of Administration.

Defendants rely largely on *Shingle Co. v. Lumber Co.*, 178 N.C. 221, 100 S.E. 332 (1919), where the plaintiffs offered a deed dated July 3, 1896, from the State Board of Education to one Carrier and mesne conveyances connecting themselves with it. The defendants offered: (1) A grant dated May 29, 1795, to one Allison; (2) mesne conveyances connecting themselves with the Allison grant; and (3) evidence of possession since 1906 of the lands covered by the Allison grant and by their mesne conveyances. Admittedly, the Allison grant covered the land in controversy. Rejecting the plaintiffs' contention, Justice Brown, for the Court, said:

"The statute conferring title to certain lands on the president and directors of the Literary Fund, to which the State Board of Education is the successor, excepts from its operation swamp lands 'heretofore entered and granted to individuals' (Rev. Sta., ch. 67, sec. 3), and it follows that when the defendants introduced a grant from the State to David Allison, issued in 1795, and mesne conveyances to the defendants, covering the land described in the complaint, they rebutted any presumption raised by statute in favor of the deed of the State Board of Education of date 3 July, 1896.

State v. Brooks

"The effect of the introduction of the grant and the other conveyances was not only to show that the land had been granted to an individual before the statute in favor of the Literary Fund was enacted, and therefore the title did not pass by the terms and language of the statute, but also to establish title in the defendants, nothing else appearing, and the statute in favor of the deeds of the State Board of Education provides that the presumption shall last only 'until the other party shall show that he hath a good and valid title to such lands in himself.'"

Decision in *Shingle Co. v. Lumber Co., supra,* depended upon whether the Board of Education had acquired a valid title at a tax sale subsequent to the Allison grant and prior to its deed to Carrier.

As indicated above, the evidence offered in *Shingle Co. v. Lumber Co., supra,* established that the defendants had a good and valid title to the lands in themselves unless the Board of Education had acquired a valid title under a tax deed prior to its conveyance to Carrier. Incidentally, the plaintiffs failed to show the Board of Education had acquired a good title by virtue of the tax sale.

Contrary to defendants' contention, the import of *Shingle Co. v. Lumber Co., supra,* is that, in an action such as this, title to the lands in controversy shall be taken to be in the State *unless* and *until* the other party shall show that he has a good and valid title to such lands *in himself.* In *Shingle Co. v. Lumber Co., supra,* the defendants, apart from their evidence as to possession, established the Allison grant and mesne conveyances of the land described therein from Allison to them. Here, assuming, without conceding, the subject land is included in the lands described in the Gause grant, defendants have failed to show the connected chain of title thereto from Gause to them. Thus, whether the evidence, competent or incompetent, offered by defendants was sufficient to afford an evidential basis for a finding that the subject land is included in the lands described in the Gause grant is immaterial. If G.S. 146-79 were interpreted otherwise, title to the subject land, under the circumstances of this case, would be in limbo. Presumably this statutory provision was enacted to avoid such an undesirable and chaotic result.

Since defendants failed to show they have a good and valid title to the subject land in themselves, and the identity and location of the subject land having been established by stipulation, as between plaintiff, the State of North Carolina, and defendants, G.S. 146-79 vests title in plaintiff. Thus, the court erred in submitting the issue to the jury. The question for decision being a matter of law for the court, the verdict of the jury had no legal significance and the court acted properly in setting it aside.

Obviously, the granting of plaintiff's motion for a directed verdict was a formality. For the reasons stated, plaintiff was entitled to judgment as a matter of law. Therefore, the judgment of Judge Bone is affirmed.

Affirmed.