J. T. TAYLOR, JR., Petitioner v. R. G. JOHNSTON AND WIFE, MARGARET K. JOHNSTON; WILLIAM P. MAYO AND WIFE, ANNA BALL MAYO; ROSA HENRIES PRICE, WIDOW; NOAH W. GASKILL AND WIFE, HATTIE I. GASKILL LAND, WIDOW; JOHNNY GASKILL AND WIFE, VELVA GASKILL; VERA GASKILL RICE AND HUSBAND, ROOSEVELT RICE; CHARLOTTE GASKILL HOBBS, WIDOW; MARY GASKILL KITTINGER AND HUSBAND, A. R. KITTINGER; ANNIE L. GASKILL MOORE AND HUSBAND, HUBERT L. MOORE; EVA GASKILL CLEMMONS AND HUSBAND, LEONARD TERRY CLEMMONS; POLLY M. WILLIAMSON, WIDOW; LUTHER GASKILL AND WIFE, LUCY GASKILL; EDDIE GASKILL AND WIFE, EVA GASKILL; MARCUS GASKILL AND WIFE, LINA GASKILL; CHARITY DOWTY AND HUSBAND, TOLLIE DOWTY; EVELYN SPAIN AND HUSBAND, ROYCE SPAIN; THELMA HARRIS, WIDOW; ALVITA HOPKINS, WIDOW; MINNIE MAYO AND HUSBAND, GRANT MAYO; BLANCHE GOODWIN LUPTON AND HUSBAND, MANNING LUPTON; FURNEY GOODWIN AND WIFE, ANNIE GOODWIN; VIOLET GOODWIN IRELAND, WIDOW; EVA GOODWIN RIGGS AND HUSBAND, SETH RIGGS; ELMO GOODWIN AND WIFE, HELEN GOODWIN; MAGGIE GOODWIN DANIELS AND HUSBAND, OSCAR DANIELS; MARION GOODWIN AND WIFE, FRANCES GOODWIN; BERNICE ALCOCK LATHAM, WIDOW; WEYERHAUSER COMPANY; GENTRY POTTER WILLIAMS AND HUSBAND, MANLEY WILLIAMS; ORIEN C. POTTER AND WIFE, WAYNE RAYE POTTER; VERNARD B. HOLLOWELL, TRUSTEE; THURMAN M. POTTER AND WIFE, EMMA V. POTTER; J. DENARD CARAWAN AND WIFE, ELMA CARAWAN; H. M. CARPENTER AND WIFE, MARY S. CARPENTER; R. H. MORRISON, JR., AND WIFE, GLADYS S. MORRISON; THE NORTH CAROLINA WILDLIFE RESOURCES COMMISSION; BRUCE B. CAMERON AND WIFE, LOUISE W. CAMERON; MARIE J. LEARY, EXECUTRIX OF THE WILL OF SYLVESTER J. LEARY, DECEASED; FIRST-CITIZENS BANK & TRUST COMPANY, TRUSTEE FOR BRUCE B. CAMERON III; ERVIN L. SADLER AND WIFE, RENA SADLER; EFFIE J. SADLER, WIDOW; WATEMAN SADLER; CARL F. ALCOCK AND WIFE, BIRMA L. ALCOCK; WILLIAM B. RODMAN, JR.; CAMMIE R. ROBINSON, WIDOW; HANNAH R. CURTIS AND HUSBAND, GEORGE R. CURTIS; OLZIE C. RODMAN, WIDOW; JOHN C. RODMAN AND WIFE, ELIZABETH M. RODMAN; OLZIE C. RODMAN II, UNMARRIED; ARCHIE C. RODMAN AND WIFE, MEREDITH M. RODMAN; OWEN G. RODMAN AND WIFE, ELIZABETH W. RODMAN; CLARK RODMAN AND WIFE, MAVIS L. RODMAN; CAMILLUS H. RODMAN AND WIFE, HELEN M. RODMAN; W. BLOUNT RODMAN AND WIFE, MARTHA O. RODMAN; W. C. RODMAN AND WIFE, EFFIE T. RODMAN; OWEN H. GUION, JR., AND WIFE, ELIZABETH H. GUION; LIDA R. GUION, UNMARRIED; JULIA GUION MITCHELL AND HUSBAND, JOHN W. MITCHELL; THEODORA R. CHERRY AND HUSBAND, RICHARD F. CHERRY; CHARLOTTE R. ANDREW AND HUSBAND, J. H. B. ANDREW; NATHANIEL F. RODMAN, JR., TRUSTEE FOR THE

Taylor v. Johnston

ESTATE OF N. F. RODMAN, DECEASED; AND ELIZABETH
K. GUION, WIDOW

No. 26

(Filed 14 May 1976)

1. **Partition § 5— effect of decree of partition — common law**

    Under the common law, a decree in partition did not transfer
    or change legal title to any of the property, but the partition could
    be effected only by an exchange of deeds between the parties pursuant
    to the court's decree.

2. **Partition §§ 5, 12— 1835 decree of partition — ineffectiveness to pass
    title**

    An 1835 decree confirming a report of division of an intestate's
    lands which ordered the intestate's heirs to execute to each other
    deeds for their respective shares did not pass legal title and could
    not constitute a link in petitioner's chain of title absent evidence of
    compliance by the parties or of an order of attachment by the court
    to enforce its decree; nor did the subsequent enactment of G.S. 1-227
    remedy this break in petitioner's chain of title where the court did
    not declare in its decree that the effect of the decree was to transfer
    title to the property as directed by the court.

3. **Ejectment § 10; Trespass to Try Title § 4— showing of ownership of
    some interest in land**

    In any action to try title where it is denied that petitioner owns
    any interest in the land, petitioner's action cannot be dismissed if his
    evidence is sufficient to warrant a finding that he owns some interest
    in the land entitling him to the present right of possession, and peti-
    tioner is not required to establish the exact interest claimed in his
    pleading.

4. **Execution § 13; Trespass to Try Title § 3— sheriff's deed — admission
    without objection**

    Where a sheriff's deed was admitted without objection, it should
    have been considered for whatever probative value it contained.

5. **Evidence § 30— ancient documents**

    A hearsay exception in favor of recitals in ancient deeds is recog-
    nized in North Carolina.

6. **Evidence § 30— ancient documents**

    An ancient document is one which bears a date of thirty years
    or more before the date it is offered into evidence and requires no
    further authentication when produced from proper and natural cus-
    tody free from suspicious circumstances.

7. **Evidence § 30— ancient document — muniment of title — evidence of
    possession**

    It is not necessary to fortify an ancient document with evidence
    of possession or occupation in order to offer it as a muniment of title,

8. **Evidence § 30; Deeds § 4; Execution § 13— sheriff's deed — recitals of live execution — ancient document rule**

Where a 121-year-old sheriff's deed was produced from proper custody without any intimation of fraud or invalidity, the general rule requiring proof of the underlying documents of the judgment and execution sale must yield to the ancient document rule; therefore, recitals in the sheriff's deed were *prima facie* evidence that the sale was made pursuant to a live execution in the sheriff's hands.

9. **Descent and Distribution § 1— presumption of intestacy**

Trial court's finding that petitioner's evidence failed to establish whether his predecessor died testate or intestate does not comport with the rule in this jurisdiction that there is a presumption that a decedent dies intestate.

10. **Ejectment § 10; Trespass to Try Title § 4— proof of chain of title from State to petitioner by mesne conveyances**

When a party proves a chain of title from the State to himself by *mesne* conveyances, he has made out a *prima facie* title to the interest proven in the lands described in the petition.

11. **Adverse Possession §§ 1, 25— signs indicating wildlife management area — no adverse possession**

The posting of signs by the Wildlife Resources Commission indicating that an area is a wildlife management area was insufficient to constitute adverse possession of the area by the Commission.

12. **Ejectment § 7; Trespass to Try Title § 2— Marketable Title Act — applicability — nonpossessory interests**

The Real Property Marketable Title Act did not extinguish respondent's rights to the land in controversy where respondent was in actual and open possession of the land when this action under the Torrens Act was instituted and still retains such possession. G.S. 47B-1.

13. **State § 2— presumption of title in State — effect of Marketable Title Act**

The Real Property Marketable Title Act does not affect the statute creating the presumption in suits for land to which the State or a State agency is a party that title is in the State or State agency. G.S. 146-79.

ON 15 July 1969, petitioner J. T. Taylor, Jr., instituted a proceeding pursuant to Chapter 43 of the General Statutes of North Carolina to have certain lands located in Pamlico County registered under the Torrens system. He alleged fee simple ownership in 4,500 acres of land described by metes and bounds. He made all known persons who might have any vested or contingent claims in the land parties to the action. The North Carolina Wildlife Resources Commission (Commission) was one of the parties named as having an adverse interest in the

land. After receiving notice pursuant to G.S. 43-10, the Commission filed an answer asserting ownership in that portion of the lands described in the petition which lies north of Mouse Harbor Canal. The petition, answer and exhibits were submitted to Sherman T. Rock, Title Examiner, who heard evidence from both the petitioner and the respondent.

Petitioner relied upon a chain of *mesne* conveyances to a grant from the State to vest title in him. Respondent relied upon a deed from the State of North Carolina and the North Carolina State Board of Education to the North Carolina Board of Conservation and Development dated 5 May 1945 and recorded in Pamlico County Public Registry which purported to convey that portion of the land described in the petition lying north of Mouse Harbor Canal. Respondent also relied upon the provisions of G.S. 143-248 to vest title to the lands described in said deed in it, and contended that it thereby acquired at least color of title to the land.

The Commission offered additional evidence tending to show that the lands north of Mouse Harbor Canal were posted with signs reading "North Carolina Wildlife Management Area" and "North Carolina Wildlife Management Area Boundary Line." Respondent contended that this evidence was sufficient to vest title to the lands in controversy by adverse possession under color of title. The examiner of title found that petitioner had proven an unbroken chain of title through *mesne* conveyances from a grant from the State into petitioner and that respondent had produced no evidence to support its claim of color of title or to support its claim of twenty years adverse possession. He concluded that petitioner was the owner in fee simple of that tract of land described in the petition except for about twenty acres lying west of Drum Creek Ditch which was omitted from the litigation by an oral stipulation of the parties.

Respondent, Wildlife Commission, filed exceptions to the crucial findings of fact and conclusions of law and the cause was then submitted to Judge L. Bradford Tillery for decision.

Petitioner, in support of his claim of ownership, relied upon and offered into evidence before Judge Tillery the following documents:

1. A grant (No. 602), dated 22 December 1798, from the State of North Carolina to John Gray Blount recorded in Book 99, page 234, Beaufort County Registry.

2. A document, dated 4 March 1835, authorizing five named commissioners to allot in severalty the lands, including Grant No. 602, held by John Gray Blount upon his death intestate. This document directed the commissioners to return their report before the Beaufort Court of Equity. At the Fall Term 1835 Session of the Beaufort Court of Equity, the Clerk entered the following notation at the end of the commissioners' report of division:

> At Fall Term A.D. 1835 Before the Honorable John A. Donnell Judge presiding the foregoing report of division was returned and confirmed and the cause is retained for further proceedings.
>
>               *   *   *
>
> It appearing to the Court that the defendants are now all of full age. It is ordered by the Court that all parties in the case made stand firm and that the parties execute to each other deeds for their respective shares. . . .

This document was recorded in February 1888 at the Clerk's office in Beaufort County.

3. A deed dated 18 February 1848 from the Sheriff of Beaufort County to William B. Rodman and recorded in the Beaufort County Registry. This deed purportedly conveyed the lands described in Grant No. 602.

4. A quitclaim deed from William B. Rodman, Jr., et al, to petitioner dated 29 December 1967, recorded at the Pamlico County Registry, conveying all of the grantors' interest in the land described in the grant (No. 602) to John Gray Blount.

J. T. Taylor, Jr., also offered a map and parol evidence identifying and locating the land purportedly described in the above documents. Petitioner further offered testimony to the effect that the grantors in the quitclaim deed from William B. Rodman and others to J. T. Taylor, recorded in Book 148, page 536, Pamlico County Registry, were all the heirs of William B. Rodman, the grantee in the sheriff's deed recorded in Book 24, page 331, Pamlico County Public Registry.

Respondent offered evidence of a deed from the State of North Carolina and the North Carolina Board of Education to the Department of Conservation and Development, dated 5 May 1945 and recorded in Book 121, page 121, Pamlico County Public Registry and relied upon G.S. 143-248 as evidence of

transfer of the lands in controversy to it. The Commission offered parol testimony tending to show that beginning in 1956 or 1957, respondent posted signs around the perimeter of the area which read: "Wildlife Game Management Area," and at other times subsequent to 1956 signs were erected which read: "Wildlife Management Area Boundary Line. North Carolina Wildlife Resources Commission." In 1963, pursuant to an agreement with the Pamlico County Health Department, respondent began constructing impoundments upon the land for mosquito-control purposes. Other improvements were thereafter constructed which included twelve miles of dikes, pumping stations, pumps, motor equipment, sheds and several utility buildings. Respondent's employees went on the property regularly for maintenance purposes and students spent considerable time there during the summer months.

In rebuttal, petitioner offered several witnesses who said that they hunted the questioned area during various periods from 1956 to the date of trial and had not observed the signs allegedly posted by the Commission.

Judge Tillery's extensive findings of fact included the following:

PETITIONER'S CLAIM:

3. The lands described in Grant No. 602 were allotted to Thomas H. Blount, the son of John Gray Blount, by instrument recorded in the Office of the Clerk of Superior Court of Beaufort County. Although said instrument bears the designation "Will of John Gray Blount" testimony establishes that the said John Gray Blount died intestate at an undetermined date. The instrument recorded in the Office of the Clerk of Superior Court of Beaufort County is not a will but rather a report of division of the lands of John Gray Blount which was filed by Commissioners appointed by the Superior Court of Beaufort County to divide his lands among his surviving heirs. Said report of Commissioners was confirmed by the court at the Fall Term 1835. The order entered by the Court directed the heirs of John Gray Blount who were parties to that proceeding to execute to each other deeds for the respective shares allotted to them. No evidence was introduced showing that the parties to that proceeding executed to each other deeds as required by said order.

4. In 1848 the lands described in Grant No. 602 were sold by the Sheriff of Beaufort County to William B. Rodman in order to satisfy a judgment entered against Thomas H. Blount. This deed specifically excepted from the conveyance all portions of the lands described in Grant 602 that had been previously sold by John Gray Blount or Thomas H. Blount. No evidence was introduced by petitioner establishing whether or not John Gray Blount or Thomas H. Blount had previously conveyed out any portion of said lands and, therefore, the exact lands conveyed by said deed, if any, has not been established.

5. By quitclaim deed recorded in Book 48, page 536, Pamlico County Registry, the heirs of William B. Rodman conveyed to John T. Taylor, petitioner herein, "all the interest of the parties of the first part to that tract of land granted to John Gray Blount in 1794, being Patent No. 602, originally containing 1,920 acres, and known as the Porpoise Marshes."

Although the evidence establishes that the grantors in this deed were all of the heirs of William B. Rodman who would have taken per stirpes at his death if he died intestate, the evidence fails to establish by direct testimony or otherwise whether the said William B. Rodman died testate or intestate and also fails to show that he was seized of said lands at the time of his death.

RESPONDENT'S CLAIM:

1. That respondent's claim of record title is based upon a deed from the State of North Carolina and the North Carolina Board of Education to the Department of Convervation (sic) and Development, dated 5, 1945, and recorded in Book 121, page 121, Pamlico County Registry, on February 13, 1957.

2. That the lands described in said deed were transferred to the North Carolina Wildlife Resources Commission by virtue of GS 143-248 in 1947.

\*          \*          \*

7. The action of the Commission in posting those lands north of Mouse Harbor Canal as Wildlife lands and in continuously maintaining same as Wildlife management area since the mid-1950's was such as to place the whole

Taylor v. Johnston

world on notice that the Commission was claiming title to said area. Such exercise of control over said area together with the posting of same as wildlife lands, in the absence of a cooperative agreement with the purported true owner, is clearly inconsistent with and adverse to a claim of private ownership of the area. No such cooperative agreement was entered into with regard to the area in question.

Judge Tillery thereupon concluded and decreed:

1. That petitioner has failed to show good and sufficient record title in fee simple to that portion of the real property described in the petition which lies north of the Mouse Harbor Canal; and that the exceptions of the respondent Wildlife Resources Commission are well taken and should be allowed.

2. That even if petitioner had established record title to that area lying north of the Mouse Harbor Canal, fee simple title to same had vested in the respondent Wildlife Resources Commission prior to the filing of this action by virtue of its adverse possession of the area.

WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

1. That the North Carolina Wildlife Resources Commission is the owner in fee simple of that portion of the lands described in the petition filed herein which lies north of the Mouse Harbor Canal.

2. That the petition filed herein be and the same is hereby dismissed insofar as it pertains to any portion of the lands described therein which lies north of Mouse Harbor Canal.

3. That petitioner pay the costs of this action.

Petitioner appealed and the North Carolina Court of Appeals affirmed, holding that: (1) the report of the division of the lands of John Gray Blount did not vest legal title in Thomas Blount, (2) petitioner failed to prove the existence of a judgment and live execution in the hands of the sheriff and, therefore, it could not rely on the sheriff's deed to William B. Rodman as a link in his chain of title.

We allowed certiorari on 11 December 1975 pursuant to G.S. 7A-31.

*Henderson, Baxter & Davidson, by David S. Henderson, and Taylor and Marquardt, by Nelson W. Taylor III, for petitioner appellant.*

*Attorney General Edmisten, by Assistant Attorney General Roy A. Giles, Jr., for respondent appellees.*

BRANCH, Justice.

Petitioner proceeds under Chapter 43 of the General Statutes which is generally referred to as "the Torrens Law." Pursuant to the provisions of Chapter 43, anyone in peaceable possession of land in this State who claims an estate of inheritance therein may prosecute a special proceeding against all the world to establish his title thereto, to determine all adverse claims and to have the title registered. G.S. 43-6. When the Commission filed its answer, the allegations of the petition were controverted as to the lands lying north of Mouse Harbor Canal and the provisions of G.S. 43-11 were activated. *Paper Co. v. Cedar Works,* 239 N.C. 627, 80 S.E. 2d 665. The pertinent portions of G.S. 43-11 provide:

> (a) Referred to Examiner.—Upon the return day of the summons the petition shall be set down for hearing upon the pleadings and exhibits filed. If any person claiming an interest in the land described in the petition or any lien thereon, shall file an answer, the petition and answer, together with all exhibits filed, shall be referred to the examiner of titles, who shall proceed, after notice to the petitioner and the persons who have filed answer or answered, to hear the cause upon such parol or documentary evidence as may be offered or called for and taken by him, and in addition thereto make such independent examination of the title as may be necessary. Upon his request the clerk shall issue a commission under seal of the court for taking such testimony as shall be beyond the jurisdiction of such examiner.

> (b) Examiner's Report.—The examiner shall, within thirty days after such hearing, unless for good cause the time shall be extended, file with the clerk a report of his conclusions of law and fact, setting forth the state of such title, any liens or encumbrances thereon, by whom held, amount due thereon, together with an abstract of title to the lands and any other information in regard thereto affecting its validity.

(c) Exceptions to Report.—Any of the parties to the proceeding may, within twenty days after such report is filed, file exceptions, either to the conclusions of law or fact. Whereupon the clerk shall transmit the record to the judge of the superior court for his determination thereof; such judge may on his own motion certify any issue of fact arising upon any such exceptions to the superior court of the county in which the proceeding is pending, for a trial of such issue by jury, and he shall so certify such issue of fact for trial by jury upon the demand of any party to the proceeding. If, upon consideration of such record, or the record and verdict of issues to be certified and tried by jury, the title be found in the petitioner, the judge shall enter a decree to that effect, ascertaining all limitations, liens, etc., declaring the land entitled to registration accordingly, and the same, together with the record, shall be docketed by the clerk of the court as in other cases, and a copy of the decree certified to the register of deeds of the county for registration as hereinafter provided. Any of the parties may appeal from such judgment to the Supreme Court, as in other special proceedings.

Any decree entered by the examiner must be "approved by the Judge of the Superior Court, who shall review the whole proceeding and have power to require any reformation of the process, pleadings, decrees or entries." G.S. 43-12.

In *Paper Co. v. Cedar Works, supra,* Justice Ervin, speaking for the Court, concisely stated the law and rules governing contested hearings in a Torrens proceeding. We quote from that case:

On a hearing before an examiner in a contested proceeding to register a land title under the Torrens Law, the same rules for proving title apply as in actions of ejectment and other actions involving the establishment of land titles. *Perry v. Morgan,* 219 N.C. 377, 14 S.E. 2d 46; *Thomasson v. Coleman,* 176 Ga. 375, 167 S.E. 879; *Glos v. Cessna,* 207 Ill. 69, 69 N.E. 634; 76 C.J.S., Registration of Land Titles, sections 18, 19.

These rules for proving title to land are presently relevant:

1. The general rule is, that the burden is on the plaintiff, in the trial of an action of ejectment or other action

involving the establishment of a land title, to prove a title good against the world, or a title good against the defendant by estoppel. *Shelley v. Grainger,* 204 N.C. 488, 168 S.E. 736; *Rumbough v. Sackett,* 141 N.C. 495, 54 S.E. 421; *Campbell v. Everhart,* 139 N.C. 503, 52 S.E. 201; *Mobley v. Griffin,* 104 N.C. 112, 10 S.E. 142.

2. The plaintiff in an action of ejectment or other action involving the establishment of a land title may safely rest his case upon showing such facts and evidences of title as would establish his right to the relief sought by him if no further testimony were offered. *Power Company v. Taylor,* 196 N.C. 55, 144 S.E. 523; *Singleton v. Roebuck,* 178 N.C. 201, 100 S.E. 313; *Moore v. McClain,* 141 N.C. 473, 54 S.E. 382; *Mobley v. Griffin, supra.* "This *prima facie* showing of title may be made by either of several methods." *Mobley v. Griffin, supra.* See also, in this connection: *Conwell v. Mann,* 100 N.C. 234, 6 S.E. 782.

3. The several methods of showing *prima facie* title to land in actions of ejectment and other actions involving the establishment of land titles are enumerated in the famous case of *Mobley v. Griffin, supra.*

4. This is one of the enumerated methods: The plaintiff proves a *prima facie* title to land by tracing his title back to the State as the sovereign of the soil. *McDonald v. McCrummen,* 235 N.C. 550, 70 S.E. 2d 703; *Moore v. Miller,* 179 N.C. 396, 102 S.E. 627; *Caudle v. Long,* 132 N.C. 675, 44 S.E. 368; *Prevatt v. Harrelson,* 132 N.C. 250, 43 S.E. 800; *Mobley v. Griffin, supra; Graybeal v. Davis,* 95 N.C. 508. The plaintiff satisfies the requirements of this method of proving a *prima facie* title when his evidence shows a grant from the State covering the land described in his complaint and *mesne* conveyances of that land to himself. *Power Company v. Taylor, supra; Buchanan v. Hedden,* 169 N.C. 222, 85 N.C. 417; *Land Co. v. Cloyd,* 165 N.C. 595, 81 S.E. 752; *Deaver v. Jones,* 119 N.C. 598, 26 S.E. 156.

5. The plaintiff in an action of ejectment or other action involving the establishment of a land title need not prove a title alleged by him if it is judicially admitted by the defendant. *Collins v. Swanson,* 121 N.C. 67, 28 S.E. 65; 28 C.J.S., Ejectment, section 81.

Taylor v. Johnston

6. Where it appears from the showing of a *prima facie* title by the plaintiff or the judicial admission of the defendant that the land in dispute in an action of ejectment or other action involving the establishment of a land title is within the external boundaries of the plaintiff's deed and that the defendant claims it under an exception in such deed, the burden is on the defendant to bring himself within such exception by proper proof. *Boyd v. Lumber Co.*, 185 N.C. 559, 117 S.E. 714; *Bright v. Lumber Co.*, 184 N.C. 614, 113 S.E. 506; *Southgate v. Elfenbein*, 184 N.C. 129, 113 S.E. 594; *Lumber Co. v. Cedar Company*, 142 N.C. 411, 55 S.E. 304; *Batts v. Batts*, 128 N.C. 21, 38 S.E. 132; *Wyman v. Taylor*, 124 N.C. 426, 32 S.E. 740; *Bernhardt v. Brown*, 122 N.C. 587, 29 S.E. 884; 65 Am. S. R. 725; *Basnight v. Smith*, 112 N.C. 229, 16 S.E. 902; *Steel and Iron Co. v. Edwards*, 110 N.C. 353, 14 S.E. 861; *Midgett v. Wharton*, 102 N.C. 14, 8 S.E. 778; *King v. Wells*, 94 N.C. 344; *Gudger v. Hensley*, 82 N.C. 481; *McCormick v. Monroe*, 46 N.C. 13. To do this, the defendant must present evidence sufficient to identify the *locus in quo* and locate it upon the surface of the earth inside the exception. *McBrayer v. Blanton*, 147 N.C. 320, 72 S.E. 1070; *Steel and Iron Co. v. Edwards, supra*.

If there be a hiatus or break in petitioner's chain of title, there can be no benefit from earlier conveyances. *State v. Brooks*, 279 N.C. 45, 181 S.E. 2d 553; *Sledge v. Miller*, 249 N.C. 447, 106 S.E. 2d 868; *Norman v. Williams*, 241 N.C. 732, 86 S.E. 2d 593; *Mobley v. Griffin*, 104 N.C. 112, 10 S.E. 2d 142.

The Court of Appeals held that petitioner's chain of title was first severed by the document purporting to be the will of John Gray Blount. The record shows this document to actually be the report of commissioners appointed by the Beaufort Court of Equity to divide the lands of John Gray Blount, deceased. The commissioners returned their report to the Fall Term Session of the Beaufort Court of Equity and by their report allotted to Thomas H. Blount that portion of the lands of John Gray Blount known as the "Pamlico and Porpose (sic) Marshes," being Grant 602. In its decree of confirmation the court ordered that the parties "execute to each other deeds for their respective shares."

Taylor v. Johnston

Petitioner introduced no evidence tending to show compliance by the parties or that the court ever entered any order of attachment to enforce it decree.

In Volume 68, C.J.S. Partition, § 164, page 274, it is stated:

> In equitable proceedings for partition, since an order or decree confirming the report of commissioners appointed to make partition does not of itself, in absence of statute, vest legal title . . . the execution of conveyances is necessary therefore except where, by force of statute, the necessity of a conveyance is obviated. . . . In a proceeding at law, however, no conveyance is necessary unless required by statute, inasmuch as the parties are seized of their shares and the partition only adjust their rights.

See also 59 Am. Jur. 2d, Partition, § 88, at 845.

The United States Supreme Court considered a proceeding in equity to divide real estate in the case of *Gay v. Parpart*, 106 U.S. 679, 27 L.Ed. 256, 1 S.Ct. 456. There the Court, *inter alia*, stated:

> It was another principle of the chancery jurisdiction in partition, that a decree itself did not transfer or convey title even after the allotment of the respective shares of each of the parties to the proceeding, but that the legal title remained as it was before.
>
> In this respect, a decree in chancery was unlike the writ of partition at the common law, which in such cases operated on the title only by way of estoppel. In the chancery proceeding, however, this difficulty was remedied by a decree that the parties should make the necessary conveyances to each other, which, if they refused, they could be compelled to do by attachment, imprisonment and other powers of the court over them in person.

[1] Under the common law, a decree in partition did not transfer or change legal title to any of the property. The partition could be effected only by exchange of deeds between the parties pursuant to the court's decree. 59 Am. Jur. 2d Partition, § 88; *Gay v. Parpart, supra.*

In *Proctor v. Ferebee,* 36 N.C. 143, this Court considered a decree allotting land and there stated:

> We must remark that the defendant is mistaken as to the ground of the recovery at law. The Court expressly

declined questioning the operation of the decree on the interest of Mrs. Ferebee merely on the ground that she was not a party to the suit. It was so declined because, if she had been a party, the decree could not have affected her legal title, for the reason that a decree in equity does not profess and *cannot per se divest a title at law, but only obliges a person who has the title and who is mentioned in the decree to convey as therein directed.* . . . [Emphasis ours.]

Petitioner, relying on *Bank v. Leverette,* 187 N.C. 743, 123 S.E. 68, first contends that the powers of a court of law and a court of equity are equal with respect to judgments and decrees affecting title to realty. We disagree. In *Leverette,* this Court held that once the possessory rights of a cotenant were defined by judgment or decree, a writ of possession or a writ of assistance would issue to put them into possession of the portion that was rightfully theirs. We find no intimation in *Leverette* that a decree from a court of equity ordering the cotenants to exchange deeds had the same effect as a judgment at law finally determining the respective rights of the parties.

Petitioner further argues that even if legal title did not vest in Thomas H. Blount upon the confirmation of the commissioners' report, the enactment of G.S. 1-227, 1-228 as reported in Session Laws of 1850 remedied this break in the chain of title. (Session Laws 1850, c. 107, s. 2, 4.) The Court of Appeals, holding that the date of confirmation rather than the date of recording determined the applicable law, noted that the decree was confirmed prior to the enactment of G.S. 1-227. Also the Court of Appeals decided that G.S. 1-227 does not have retroactive effect. We need not explore the reasoning of the Court of Appeals since it is apparent that by their very terms the statutes are not here applicable. At the time of its enactment in 1850, G.S. 1-227 provided:

§ 1-227. *When passes legal title.*—In any action wherein the court declares a party entitled to the possession of real or personal property, the legal title of which is in another party to the suit, and the court orders a conveyance of such legal title to him so declared to be entitled. . . . [T]he court, after declaring the right and ordering the conveyance, has power . . . *to declare in the order then made, or in any made in the progress of the cause, that the effect thereof is to transfer to the party to whom the con-*

*veyance is directed to be made the legal title of the said property, to be held in the same plight, condition and estate as though the conveyance ordered were in fact executed. . . . [Emphasis added.]*

In *Morris v. White,* 96 N.C. 91, 2 S.E. 254, this Court held that there must be strict conformity to the provisions of G.S. 1-227 in order for a decree to operate as a conveyance. The Court held that the mere fact that the court below intended for the decree to transfer title was immaterial unless the court declared that the decree "shall be regarded as a deed of conveyance."

[2] Here, the court did not declare in the order then made or in any order made in the progress of the cause that the effect of its order was to transfer title to the subject property as directed by the court. Neither does the record show any conveyance made pursuant to the decree of the Beaufort Court of Equity. Thus the legal title to the property in controversy never vested in Thomas Blount pursuant to the 1835 proceeding. The subsequent conveyances by the sheriff's deed to William B. Rodman and the heirs of William B. Rodman to petitioner could not convey an estate of greater dignity than was vested in Thomas Blount upon the death of John Gray Blount.

[3] In an action to try title where it is denied that petitioners own any interest in the land, petitioners' action cannot be dismissed if their evidence is sufficient to warrant a finding that they own some interest in the land entitling them to the present right of possession and petitioners are not required to establish the exact interest claimed in their pleadings. *Skipper v. Yow,* 249 N.C. 49, 105 S.E. 2d 205.

This record discloses that John Gray Blount died intestate and that Thomas Blount, by the laws of intestate succession, was entitled to a one-fifth undivided interest in the lands of John Gray Blount. Thus, if petitioner proves a chain of title from Thomas Blount into himself according to any one of the recognized methods of proving title, he would be entitled to a one-fifth undivided interest in the lands in controversy.

The appellee contends, however, that the sheriff's deed to William B. Rodman also created a break in petitioner's chain of title since the petitioner failed to establish the existence of the judgment upon which the execution was purportedly issued or to establish that, except by evidence of the recitals

contained in the sheriff's deed, there was a live execution in the hands of the sheriff. The sheriff's deed recited entry of judgment against Thomas Blount and that execution was thereupon issued to the Sheriff of Beaufort County to sell the lands described as Grant 602 to satisfy said judgment. It further recited due advertisement of the land and sale to William B. Rodman as the last and highest bidder at the sheriff's sale.

Our Court has considered the effect of recitals of fact in various types of deeds.

In *Sledge v. Miller, supra,* plaintiff sought to establish title by a connected chain of title from the State. One of the links in his chain of title was a deed from Grady and others as receivers of Beaufort County Lumber Company. Holding that this deed constituted a fatal break in the chain of title, this Court, speaking through Justice Rodman, stated:

> The deed from State Board of Education to Hammer Lumber Company and the deed from Hammer Lumber Company to Beaufort County Lumber Company sufficed to show, *prima facie,* title to the lands there described in the Beaufort County Lumber Company, but plaintiff failed to establish that he acquired title to the properties owned by Beaufort County Lumber Company. For that purpose he offered a deed from Grady and others, receivers of Beaufort County Lumber Company. The record does not show what recitals, if any, appear in this deed. It may be presumed, however, that the persons named as receivers in the deed claimed judicial authority to convey, and that the deed contained recitals to that effect, but the recitals, if they appear in the deed, were not, as against these defendants, sufficient to establish that fact. The burden rested on plaintiff to show that the persons named as receivers were in fact receivers and had authority to convey. This should have been established by offering the judgment roll in the action appointing receivers. [Citations omitted.]

We have also held that in a tax foreclosure action, the failure to introduce the intermediate decree and final judgment created a hiatus in the title when the parties relied on the commissioners' deed as a link in the chain of title. *Kelly v. Kelly,* 241 N.C. 146, 84 S.E. 2d 809.

The plaintiff in *Board of Education v. Gallop,* 227 N.C. 599, 44 S.E. 2d 44, relied on a sheriff's deed as a link in his

chain of title. Defendant contended the deed was invalid because it was not supported by a live execution. Plaintiff introduced an undated purported execution which contained no notation by the sheriff as to when it was received or served. Neither was entry of return on the judgment docket shown. The sheriff's deed, however, recited that it was executed pursuant to a live execution. This Court held that such recital was secondary evidence and therefore inadmissible into evidence until plaintiff proved loss or destruction of the original.

In *Walston v. Applewhite & Co.*, 237 N.C. 419, 75 S.E. 2d 138, Justice Denny, later Chief Justice, speaking for the Court, reaffirmed the rule stated in *Board of Education v. Gallop, supra,* with the following language:

> It is the rule with us that the recitals in a deed executed by a sheriff pursuant to an execution sale, are *prima facie* correct, but they are secondary evidence only and before being admitted for that purpose the loss or destruction of the original record or records involved in the controversy, must be clearly proven. *Bd. of Education v. Gallop,* 227 N.C. 599, 44 S.E. 2d 44; *Thompson v. Lumber Co.,* 168 N.C. 226, 84 S.E. 289; *Person v. Roberts,* 159 N.C. 168, 74 S.E. 322; *Isley v. Boon,* 109 N.C. 555, 13 S.E. 795. Cf. *Powell v. Turpin,* 224 N.C. 67, 29 S.E. 2d 26, and *Jones v. Percy, ante,* 239.

**[4]** The Sheriff's deed to William B. Rodman was *admitted without objection,* and should therefore have been considered for whatever probative value it contained. *Reeves v. Hill,* 272 N.C. 352, 158 S.E. 2d 529; *Freeman v. City of Charlotte,* 273 N.C. 113, 159 S.E. 2d 327.

**[5]** Although not strongly argued by the parties to this proceeding, we deem it necessary to consider the effect of the ancient document rule upon the recitals contained in the sherriff's deed. A hearsay exception in favor of recitals in ancient deeds is expressly recognized in North Carolina. *Skipper v. Yow, supra; Sears v. Braswell,* 197 N.C. 515, 149 S.E. 846; 1 Stansbury's North Carolina Evidence § 152 at 509 (Brandis Rev., 1973). If the recitals are competent evidence in the case *sub judice,* the sheriff's deed is a valid link in plaintiff's chain of title.

**[6, 7]** An ancient document is one which bears a date of thirty years or more before the date it is offered into evidence. Such

document requires no further authentication when produced from proper and natural custody free from suspicious circumstances, indicative of fraud or invalidity. *Spears v. Randolph,* 241 N.C. 659, 86 S.E. 2d 263; 2 Stansbury's North Carolina Evidence § 196 at 121 (Brandis Rev. 1973). In this connection, we note that it is no longer necessary to fortify an ancient document with evidence of possession or occupation in order to successfully offer it as a muniment of title. *Nicholson v. Lumber Co.,* 156 N.C. 59, 72 S.E. 86.

In *Harding v. Cheek,* 48 N.C. 135, the plaintiff relied on a sheriff's deed executed in 1775 which recited the existence of executions upon which the sale was founded. The action was instituted in 1855. Defendant contended that there was no proof of the existence of a judgment or that the sheriff levied upon and sold the land. The Court, without mentioning that the recital was a part of an ancient deed, held that the recitals in the deed were *prima facie* evidence of the facts set forth. However, this Court, in the case of *Rollins v. Henry,* 78 N.C. 342, interestingly enough, in an opinion by Justice Rodman, clarified the holding in *Harding v. Cheek,* with this language:

> The rule which seems to be established, and which is supported by reason, appears to be this: The return to an execution is ordinarily the best evidence of a levy and sale under it. But when the execution has not been returned to the clerk's office, and it, with any return on it, has been destroyed or lost, and it is proved otherwise than the recital that there was a judgment and execution, the recital in a sheriff's deed is *prima facie* evidence of the levy and sale, they being official acts of the sheriff, even although the sale was not a recent one. This rule is intended to be applicable only to cases like the present, and does not touch cases like *Hardin v. Cheek, where the deed was an ancient one, but there was no proof of a judgment and execution. . . .* [Emphasis ours.]

In *Sledge v. Elliott,* 116 N.C. 712, 21 S.E. 797, administrators were licensed to sell certain lands in the year 1865. Plaintiff, seeking a recovery of a portion of these lands, relied on a deed authorized by this court order. The North Carolina Supreme Court affirmed the judgment for the plaintiff and, *inter alia,* stated:

> . . . After the expiration of thirty years, the recital in the deed, that the sale was made in pursuance of a decree

of the court entered in this cause, must be presumed to be true, notwithstanding the fact that the record is not full. . . . After it had remained unimpeached for nearly 30 years, the burden of overcoming a presumption of fairness and regularity in the original record rests upon any one who seeks to disturb a title founded on it.

For other cases recognizing the efficacy of recitals in ancient documents to prove muniment of title see *Skipper v. Yow, supra; Sears v. Braswell,* 197 N.C. 515, 149 S.E. 846; and *Thompson v. Buchanan,* 195 N.C. 155, 141 S.E. 580.

[8] At the time of the institution of this action, the document or public record was 121 years old and was produced from proper custody without any intimation of fraud or invalidity. Under these circumstances, we are of the opinion that the general rule requiring proof of underlying documents must yield to the ancient document rule. We hold that the recitals in the sheriff's deed were *prima facie* evidence that the sale was made pursuant to a live execution in the sheriff's hands.

[9, 10] We are cognizant of the trial judge's finding that petitioner's evidence failed to establish whether William B. Rodman died testate or intestate. This finding does not comport with the well-established rule in this jurisdiction that there is a presumption that a decedent dies intestate. *Chisholm v. Hall,* 255 N.C. 374, 121 S.E. 2d 726; see 2 Stansbury's North Carolina Evidence § 250 (Brandis Rev. 1973). Here respondent offered no evidence to rebut this presumption. Neither is the finding that petitioner failed to show that William B. Rodman was seized of the lands at his death compatible with our rule that when a party proves a chain of title from the State into himself by *mesne* conveyances, he has made out a *prima facie* title to the interest proven in the lands described in the petition. *Paper Co. v. Taylor,* 196 N.C. 55, 144 S.E. 523; *Paper Co. v. Cedar Works, supra; Skipper v. Yow, supra.*

We now consider respondent's contention that the land in controversy vested in it by virtue of seven years adverse possession under color of title.

Assuming, *arguendo,* that the Commission has proved color of title it is, nevertheless, our opinion that the respondent has failed to show adverse possession for seven years.

In *Locklear v. Savage,* 159 N.C. 236, 74 S.E. 347, Justice Walker succinctly defined adverse possession as follows:

What is adverse possession within the meaning of the law has been well settled by our decisions. It consists in actual possession, with an intent to hold solely for the possessor to the exclusion of others, and is denoted by the exercise of acts of dominion over the land, in making the ordinary use and taking the ordinary profits of which it is susceptible in its present state, such acts to be so repeated *as to show that they are done in the character of owner,* in opposition to right or claim of any other person, and not merely as an occasional trespasser. It must be decided and notorious as the nature of the land will permit, affording unequivocal indication to all persons that he is exercising thereon the dominion of owner. . . . [Emphasis ours.]

[11]  The only evidence of adverse possession offered by respondent prior to the year 1963 consisted of signs placed on the property beginning about the year 1956 which read: "Wildlife Game Management Area." During a subsequent period there were signs which read: "North Carolina Wildlife Resources Commission Wildlife Management Area Boundary." The case of *Berry v. Cedar Works,* 184 N.C. 187, 113 S.E. 772, is very persuasive authority in support of petitioner's contention that the posting of signs indicating the area to be a wildlife management area was not sufficient to constitute adverse possession. In that case this Court, in an opinion by Justice Adams, stated:

The Court declined the prayer for instruction that keeping the land continuously and conspicuously posted for seven years was such adverse possession as would ripen the defendant's title, no one else being in the actual occupation. Admitting as a general proposition that the posting of land does not constitute sufficient adverse possession, the defendant contends that the *locus* is swamp land, uninhabitable, unfit for cultivation, and not susceptible of such actual possession as is usually available. It may be observed that the prayer contains no suggestion of the number of the notices or the places at which they were posted.

It is very generally held that the prevention of a trespass, whether by a written notice or by the employment

of agents for the purpose, is not such actual possession as is necessary to mature title to real property. The act of posting land is not equivalent to the *possessio pedis,* and as against the owner is nothing more than notice of a claim. To hold that title to land may be defeated, when the owner has only constructive possession, by the claimant's posting of notices which may never come to the owners' knowledge, would amount to a ruling sanctioned neither by reason nor by established precedent. *Lynde v. William,* 68 Mo., 360; *Lumber Co. v. Hughes,* 38 S.R. (Miss.), 769; *Cedar Works v. Stringfellow,* 236 Fed., 264.

Here there was nothing on the signs posted which indicated a claim of ownership by respondent. One who observed the signs placed on the contested area could well assume that the Wildlife Commission was conducting studies or experiments thereon, or that it was leasing the property, or as the respondent admits, that the area was not posted but was for public use. The signs, unlike those in *Berry v. Cedar Works, supra,* did not suggest that one who came upon the property was a trespasser. We, therefore, hold that the posting of the signs by respondent for the required period of time is not such possession as would mature title in it.

This proceeding was instituted on 15 July 1969, thus whether the improvements by the respondent consisting of dikes, impoundments, pumping stations, sheds and other structures were of such adverse nature as would mature title in respondent is not relevant to this contention since the improvements were not commenced seven years before action was instituted by petitioner.

Petitioner argues that the Real Property Marketable Title Act cures any technical defects in his record of title so as to vest a fee simple title in him as sole owner of the lands in controversy. We do not agree. G.S. 47B-1, in part, provides:

§ 47B-1. *Declaration of policy and statement of purpose.*—It is hereby declared as a matter of public policy by the General Assembly of the State of North Carolina that:

\*     \*     \*

(2) Nonpossessory interests in real property, obsolete restrictions and technical defects in titles which have been placed on the real property records at

remote times in the past often constitute unreasonable restraints on the alienation and marketability of real property.

*    *    *

It is the purpose of the General Assembly of the State of North Carolina to provide that if a person claims title to real property under a chain of record title for 30 years, and no other person has filed a notice of any claim of interest in the real property during the 30-year period, then all conflicting claims based upon any title transaction prior to the 30-year period shall be extinguished.

G.S. 47B-3 provides that such marketable record does not affect or extinguish the following rights:

> (3)  Rights, estates, interests, claims or charges of any person who is in present, actual and open possession of the real property so long as such person is in such possession.

In Am. Jur. 2d, Adverse Possession § 14, it is stated:

> . . . Thus, in determining what will amount to actual possession of land, considerable importance must be attached to its nature, character, and locality, and to the uses to which it can be applied, or to which the claimant may choose to apply it. The possession is not required to be more full than the character of the land admits. . . . The possession of marsh land contemplated by law is that which is commensurate with its nature, chief value, and by the extent of operations conducted thereon which the character of the soil and its surroundings may reasonably permit. . . .

In June 1963, the Commission began construction of impoundments on the land *sub judice*. Twelve miles of dikes were constructed which created four water-control impoundments and the Commission also erected pumping stations, equipment sheds and other structures on the land. Respondent had employees who regularly maintained the improvements.

[12, 13]  In our opinion, this record discloses that the Commission was in actual and open possession of the lands in controversy prior to the time that this action was instituted and that said respondent still retains such possession. Under these circumstances, the Marketable Title Act does not extinguish respond-

ent's rights in the land in controversy. Neither does the act affect the provisions of G.S. 146-79 which, in part, provides:

> In all controversies and suits for any land to which the State or any State agency or its assigns shall be a party, the title to such lands shall be taken and deemed to be in the State or the State agency or its assigns until the other party shall show that he has a good and valid title to such lands in himself.

In *State v. Brooks*, 279 N.C. 45, 181 S.E. 2d 553, this Court considered the effect of G.S. 146-79. In an opinion by Chief Justice Bobbitt, this Court declared that the presumption vested title in the State and noted: "If G.S. 146-79 were interpreted otherwise, title to the subject land would be in limbo. Presumably this statutory provision was enacted to avoid such an undesirable and chaotic result."

We hold that: (1) the North Carolina Wildlife Resources Commission is the owner in fee simple of a four-fifths undivided interest in that portion of Grant No. 602 described in the petition which lies north of Mouse Harbor Canal; (2) subject to record stipulations and conveyances heretofore made by him, the petitioner, J. T. Taylor, Jr., is the owner of a one-fifth undivided interest in that portion of Grant No. 602 described in the petition which lies north of Mouse Harbor Canal.

This cause is remanded to the North Carolina Court of Appeals with direction that it remand the cause to the Superior Court of Pamlico County with order that judgment be entered in accord with this opinion.

Reversed in part and remanded.